No. 84,429

STATE OF KANSAS, *Appellee*, v. MICHAEL L. KRAUS, *Appellant*.

(26 P.3d 636)

Opinion filed July 13, 2001.

*William F. Dunn*, of Kansas City, argued the cause and was on the brief for appellant.

*Jerome A. Gorman*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Michael L. Kraus, from his convictions of felony murder and aggravated kidnapping. Kraus was sentenced to life for the homicide and 184 months for the aggravated kidnapping. Kraus raises two issues on appeal, although there are several subarguments under the major issues.

Kraus maintains the trial court erred in admitting the State's Exhibit 39. The State's Exhibit 39 is a CD-ROM prepared by a law enforcement officer from a tape recording.

The second issue is whether the prosecutor committed misconduct during cross-examination and closing argument which prejudiced Kraus and requires a new trial.

Kraus does not challenge the sufficiency of the evidence which supports the convictions. Highly summarized, the facts show that the Kansas City, Kansas, police officers received information from a confidential informant that someone had been murdered at 618 10th Street and that the body might still be inside the house. The informant indicated to the police that the victim was killed because Kraus thought the victim took drug money belonging to Danny Eaton, who lived at the house on 10th Street.

The police sent a confidential informant into the house to try to buy drugs and see what information he could obtain. The informant was "wired" so that any conversation could be heard live and recorded. The informant, Richard Blackman, entered the residence and met with Kraus. Kraus eventually told Blackman that he had to "blow away" someone the previous night and that the person was outside in the back of a pickup truck.

When Kraus and Kevin Colwell came out of the house and entered a grey pickup truck parked outside, they were taken into custody. The police searched a wooden box that was secured with rope to the back of the pickup truck. Inside the box they found the body of Michael High, wrapped inside a plastic tarp and a woven rug. High's hands and legs were bound with duct tape. Inside the house the police found wood matching the lid of the box, screws and rope like those used to secure the lid and the box, tools, plastic sheeting, duct tape, a broken chair, bullet fragments, and blood in a floor drain.

In addition to the testimony by Blackman that Kraus admitted to killing someone the night before, codefendants Eaton and Andrew Rivera both testified at trial that it was Kraus who fired the fatal shot that killed High.

Kraus testified that he was not at home when High was taken into the basement and shot and killed. He testified that when he came home, High was already dead and lying on the floor of the shower in the basement.

An autopsy revealed that High had been shot twice. One shot entered his elbow and shattered the bullet. Another bullet entered his neck and traveled down toward his shoulder blade. The bullet

caused a bruising of the spinal cord, which in turn caused High to stop breathing.

Experts matched the blood from the floor drain to High's blood. Three of the four bullets recovered from either High's body or the basement floor were determined to have been fired from the .44 magnum Blackhawk Ruger taken from Kraus. The fourth bullet was too damaged to be conclusive.

Lieutenant Vince Davenport of the Kansas City, Kansas, Police Department took the audiotape cassette-recorded conversation between Kraus and Blackman and recorded it onto a computer. Through a program the police department had, he re-recorded the conversation by plugging the tape recorder into the computer and then playing the tape. The computer audio recording was identical to the audiotape cassette recording. The computer audio recording was subsequently transferred to a CD-ROM.

Davenport also created a "transcript" of the recording by listening to the recording over and over again and typing in the words he heard from Kraus and Blackman. Davenport recorded the transcript onto the CD-ROM as well. The digital audio recording was then synchronized to the transcript so that when the CD-ROM was played, the words from the transcript would appear on a computer screen at the same time the words from the audio recording were being heard through speakers.

The jury found Kraus guilty of felony murder and aggravated kidnapping. This appeal followed.

## EXHIBIT 39

Kraus raises several issues surrounding the trial court's admission of the State's Exhibit 39, which was the CD-ROM containing the digital audiotape recording of the Blackman-Kraus conversation and the "transcripted" version of the conversation.

Courts possess wide discretion in determining whether to permit the jury to use written transcripts as aids in listening to audiotape recordings. *United States v. Keck*, 773 F.2d 759, 766 (7th Cir. 1985); *United States v. Papia*, 560 F.2d 827, 844 (7th Cir. 1977); *United States v. Bentley*, 706 F.2d 1498, 1507-08 (8th Cir. 1993). Judicial discretion is abused when judicial action is arbitrary, fan-

ciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Exhibit 40 was the original tape recording that was made of the conversation between Blackman and Kraus. The tape was made by the use of a wireless microphone taped to Blackman and recorded 2 blocks away by a police officer listening to the conversation. A portion of Exhibit 40, the original audiotaped conversation, was played for the jury during Kraus' recross-examination of one of the officers. Because the audiotape was recorded at a different speed than a standard tape player uses, the officer's special tape player had to be used to play Exhibit 40 to the jury.

Exhibit 39 was the CD-ROM prepared by Davenport from the tape-recorded conversation between Kraus and Blackman. The trial court ruled that the transcript portion of the CD-ROM was not evidence and so instructed the jury. Over Kraus' objection, Exhibit 39 was played for the jury. The audio portion of the CD-ROM was played over speakers while the transcript of the conversation was displayed to the jury on a wall.

Kraus first argues that Exhibit 39 was not evidence and should not have been played for the jury. The trial court, however, did not rule that Exhibit 39 was not evidence. The trial court admitted the audio portion of the CD-ROM (Exhibit 39) into evidence. The trial court ruled that the transcript portion of the CD-ROM, however, was not evidence. The digital audio portion of the CD-ROM was an exact copy of the original audiotaped recording. The trial court explained its use of Exhibit 39, stating:

"[L]adies and gentlemen, as you can imagine, this is not something that we would have done five years ago or ten years ago or maybe even one year ago, but what you're going to see here is Lieutenant Davenport's transcript basically of the conversation between Mr. Blackman and the defendant. You heard the tape recording earlier and the voices that you heard and the recording that you heard is evidence in this particular case of what was said in that particular conversation. This transcript has been prepared here and that is to aid you in understanding what is on that tape recording. However, it is for you to decide what was said or what was

not said on that tape recording, that the transcript is just to aid you in understanding what is on it. The transcript is not evidence, the recorded voices are the evidence in this case or is the evidence in this case."

Next, Kraus argues that the use of Exhibit 39 was unfairly cumulative, as Exhibit 40, which was the original audiotaped recording of the conversation between Kraus and Blackman, had already been played for the jury. Playing the identical audiotaped conversation a second time with a transcript, Kraus argues, was unnecessary and prejudicial. This argument is without merit. The State did not present Exhibit 40 to the jury. The State only used Exhibit 39, the CD-ROM. Defense counsel, however, used Exhibit 40 during recross-examination of Officer James Garrett. The use of the CD-ROM was not cumulative with the presentation of any other audiotaped evidence.

Kraus' main quarrel appears to be with the use of the transcript portion of the CD-ROM. The use of a transcript to aid in the understanding of an audio or videotape has been allowed where (1) the audiotaped conversation is difficult to understand; (2) the transcript accurately reflects the conversation; (3) inaudible portions of the audiotaped conversation are recorded as "inaudible" on the transcript; (4) the trial court instructs the jury that the audiotape is not evidence and that the evidence is the audio recording itself; (5) the jury is not allowed to take the transcript with them into the jury room for deliberations; and (6) the transcript actually aids the jury in understanding the audiotaped conversation. See *Keck*, 773 F.2d at 765-66 (no abuse of discretion in allowing jury to use transcript of audiotaped conversation as an aid as long as the jury was instructed that the transcript itself was not evidence and the jury was never allowed to have access to the transcript during deliberations separate from the audiotape); *Bentley*, 706 F.2d at 1507 (no abuse of discretion where officer testified regarding the preparation of the transcript and appellant did not assert any specific prejudice from the use of a transcript version of the audiotaped conversation to aid the jury); *Hodge v. State*, 332 Ark. 377, 395, 965 S.W.2d 766 (1998) (no prejudice in allowing jury to use transcript of audiotape as an aid where transcript was not admitted into evidence and jury was not allowed to take transcript

with them into the jury room); *Martinez v. State*, 761 So.2d 1074, 1083-87 (Fla. 2000) (no error where trial court instructed jury that the transcript was not in evidence and that jury was only to use it as an aid when listening to the audiotaped conversation); *Robertson v. State*, 268 Ga. 772, 778, 493 S.E.2d 697 (Ga. 1997) (holding that appellant's argument that trial court erred in allowing jury to use transcript as aid in listening to audiotaped conversation was without merit as trial court instructed jury that transcript was not evidence and that the jury was to consider the audiotape itself the sole evidence of the conversation); *Serano v. State*, 555 N.E.2d 487, 494 (Ind. App. 1990) (no error where trial court allowed jury to use transcripts not in evidence as an aid to listening to recorded audiotaped conversation as appellant failed to show that transcripts were inaccurate or that they prejudiced him in any way); *State v. Williams*, 948 S.W.2d 429, 432 (Mo. App. 1997) (no error in allowing jury to use transcript along with audiotaped conversation as long as jury could not take transcript into jury room during deliberations); *Brassfield v. State*, 719 P.2d 461, 462-63 (Okla. Crim. 1986) (trial court did not error in allowing jury to use transcript of audiotaped conversation where transcript was not admitted into evidence and was to be used only as an aid in following the audiotape); *Mayhue v. State*, 969 S.W.2d 503, 506-07 (Tex. Crim. 1998) (trial court did not error in allowing use of transcript as an aid to jury as defendant failed to point to any inaccuracies in the transcript and as long as transcript was not admitted into evidence).

In the present case, Davenport testified that he made the transcript directly from the audiotaped conversation as an aid to understand the audiotaped conversation. Kraus has never argued that the transcript was inaccurate or misleading. Testimony at trial indicates that the transcript was accurate. The transcript was never admitted as evidence. The trial court instructed the jury that the transcript was not evidence and that only the recorded conversation was evidence. The trial court did not abuse its discretion by allowing the transcript of the conversation to be displayed before the jury simultaneously with the playing of the CD-ROM audiotaped conversation during the trial.

After retiring, the jury requested a review of Kraus' conversation with Blackman. Although the court initially refused to allow the jury to have access to Exhibit 39 because it contained matter not in evidence (the "transcripted" version of the conversation), the court eventually decided to allow the jury to use Exhibit 39 because a special tape player required for listening to Exhibit 40 (the original taped recording) could not be located. Kraus again objected to the use of the CD-ROM. The basis for his objection appears to be that Exhibit 39 was an "enhanced" version of Exhibit 40. Kraus does not set forth why the use of Exhibit 39 was prejudicial. Kraus stated to the court:

"I think that the Court made it very clear that the tape—the original tape that was the tape recording made at the time that was made simultaneously to this conversation was the evidence in this case. The CD-ROM we objected to that to begin with. . . . The CD-ROM was made from tape is my understanding, and it was also my understanding from the testimony of Lieutenant Davenport that, you know, he had to enhance or get rid of background noise and other things that he did when he made the transfer from the tape to the CD-ROM. And so it has been changed to a certain degree, to what degree we don't know, but I would object to the use of the CD."

Kraus does not explain how the use of the CD-ROM during deliberations prejudiced him in any way. The record reflects that the CD-ROM was an exact copy of the original taped conversation between Kraus and Blackman. The jury was not allowed separate access to the transcript in the jury room. The audio portion of the CD-ROM was played to the jury in open court and the previously viewed transcript was not shown to the jury a second time.

The trial court did not abuse its discretion in allowing the jury to listen to the audio portion of the CD-ROM during deliberations in the courtroom without displaying the transcript portion of the CD-ROM.

Kraus next argues that the prosecutor committed misconduct several times during the trial which requires reversal and a new trial.

This court reviewed the standard of review for prosecutorial misconduct in *State v. Pabst*, 268 Kan. 501, 504-05, 996 P.2d 321 (2000). We stated:

"Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. See *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999). Some complained-of prosecutorial statements were not objected to at trial. If the claimed error has been determined to implicate a defendant's right to a fair trial, our standard of review is the same whether or not an objection was made at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 6, 979 P.2d 1239 (1999).

. . . .

"The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. . . . Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. *State v. Lumley*, 266 Kan. 939, Syl. ¶ 12, 976 P.2d 486 (1999)."

Kraus argues that the prosecutor committed misconduct by improperly cross-examining Jeff Maple. During cross-examination of Maple, the following exchange took place:

"Q. Mr. Maple, [have] you ever been involved of any crimes involving truth and veracity?
"A. No.
"Q. You know what crimes of truth and veracity are?
"A. No.
"Q. Okay. I'll list them for you. Burglary, theft, forgery, criminal damage to property, filing a false police report, any of those?
"A. No."

Kraus claims that the prosecutor's "persistence in cross examining on prior conviction of crimes involving truth and veracity must have damaged the witness in the eyes of the jury." Kraus' argument on this point is without merit. Kraus has failed to show how this exchange prejudiced him in any way or affected the outcome of the trial. The prosecutor's follow-up on his first question regarding conviction of any crimes for truth or veracity was appropriate and did not taint the witness in any way.

Kraus next argues that the prosecutor misstated the testimony of Maple during closing argument. Because Kraus claimed he had an alibi for the killing, one of the questions during trial was what

time Kraus was at an automobile shop on the night High was killed. Kraus argued at trial that he was at Maple's auto shop several times during the night of the shooting and that they had been out looking for a car that needed to be towed. Kraus and Maple had gone out twice during the night to search for the car and had been gone about an hour each time, spending some time at the shop before going out the second time. During closing argument the prosecutor summarized Maple's testimony as follows: "He said it was midnight—midnight when they got back to the shop." During Maple's cross-examination, the following exchange took place:

"Q. Okay. And I think you said then when you got back to your shop it was about midnight, am I right there?
"A. That's about right.
"Q. Okay. Now, what I wrote down there midnight back to shop is what you're telling us after all of this time, right?
"A. Right. That's an estimate."

Kraus argues that the prosecutor's statement during closing argument was an inaccurate summary of the actual testimony. Maple testified during direct examination that he thought Kraus returned to the shop at about 1 or 2 a.m. The record reveals that Maple was never 100% sure at what time Kraus was at the shop. During direct examination, Maple testified that he thought it was 1 or 2, but during cross-examination he estimated it to be about midnight. Kraus had the opportunity during his closing argument to point out that Maple was merely estimating the time that he was at the shop the night High was shot and killed. The prosecutor's summary of Maple's testimony was reasonably accurate and was not outside the bounds of acceptable summary of the evidence.

Kraus next argues that during the closing argument, the prosecutor implied that Maple lied. As previously noted, during closing argument, the prosecutor mentioned that Maple had testified regarding the time that Kraus was at the shop. Kraus' witnesses, Sam and Sandra Long, testified that Kraus came out to their house at about 9 or 10 p.m. the night High was shot and stayed for about 20 or 30 minutes.

While discussing the testimony of the witnesses, the prosecutor stated the following during closing argument:

"Jeff Maple and the Longs. And I guess what I want to ask you about this is— is that the Longs say they can't tell you what day he was down there, they don't know. They know he was down there someday and counsel suggested to one of them the month of April and they agreed. The other one didn't know and said I couldn't even tell you the year. Now, if it's the same day, let me ask you this, you've heard the defendant read from what he said appeared to be a letter that he had written. Well, he went down there to deliver an amount of drugs, and I think he said he got rid of two types of drugs down there while he was down there, some across town and that. Who was it that he was going to see down there to do that and how much time did he take in doing so? Could that motivate someone's testimony in testifying how they did?

"The second thing is how does the Longs' testimony, how does it fit in with what Jeff Maple told us yesterday? I mean doesn't Jeff Maple kind of just blow them out of the water when he gives us the first time they look for the car was an hour, the second time was an hour, that they wasted some time in between each time about an hour and that they wasted some time at the beginning I think he said was an hour, in between searches it was between 15 minutes and half an hour and there was some additional quarter of an hour that they wasted. You know, do the math on it yourself, that's anywhere from three and-a-half to three and three-quarters hours. He said it was midnight—midnight when they got back to the shop. We're talking in the area of 8:30, ladies and gentlemen, that Jeff Maple and the defendant set out to look for that car, yet the Longs are saying that it's 9:00 or 10:00 o'clock that he's down in Osawatomie. *Someone's not telling the truth in there if, in fact, it's the same night that he's down there with the Longs.* If it's not, then there's no problem, there's no alibi even existing." (Emphasis added.)

Kraus claims that the prosecutor should not have been allowed to insinuate that Maple lied during his testimony. The prosecutor did not, however, insinuate or imply that Maple lied. The prosecutor did point out, however, that Maple and Longs' testimony was inconsistent and that only one version could be correct. The prosecutor is allowed to point out that testimony is conflicting and inconsistent. See *State v. Graham*, 247 Kan. 388, 397-98, 799 P.2d 1003 (1990) (prosecutor may argue that witnesses' testimony was inconsistent with testimony of defendant); *State v. Smith*, 28 Kan. App. 2d 56, 67, 11 P.3d 520 (2000) (prosecutor may argue that defendant's testimony was different or inconsistent with statements he made to police). The prosecutor's statement was not outside the considerable latitude given a prosecutor during closing argument.

Finally, Kraus argues that the prosecutor improperly attempted to assert facts outside the admitted evidence during closing argument. During closing argument, the prosecutor stated:

"I'm going to kind of roll pretty fast here so I hope I don't lose any of you. Curious thing that she said was that Eaton and Rivera saying this to save their own skin. *Well, come back and tell me over in my office after this is all over how does Eaton save his skin?* All she's talked about is his parole eligibility date. He told you what his sentence was. It is a life sentence. He told you all that parole eligibility date means is that's the first time he becomes eligible. He fully understood when he pled guilty and was sentenced that he could spend the rest of his life in prison, that he may not ever make parole. It's not a decision of his or the prosecutor's.

. . . .

"Counsel also does exactly what I told you she was going to do. She paints this as this is only Eaton and Rivera putting the defendant there [at the crime scene], and you know from the tape, from Blackman, from Lisa Frank and from Beth Ann Ashley that that's not true.

"Now, she also says Beth Ann Ashley, don't believe her because, heck, she was never charged with this crime. *Well, let me tell you, this probably shouldn't come as a revelation to you that in order to have to be charged with a crime, you have to do something.* Inaction or failing to tell the police about a crime is not a reason to be charged with a crime. Just because someone is in a place where a crime occurs, if you're in a room where someone else commits a crime doesn't make *you guilty of the crime, too. Now, she wasn't in the room, she was in the floor above.* Now, maybe it's not the smartest thing to do and maybe it's not the most moral thing to do to not report it, but she's not guilty of a crime.

"The defendant says I wasn't thinking right when I said these things to Mr. Blackman, and I want you to listen to his voice again . . . ." (Emphasis added.)

A portion of the conversation between Kraus and Blackman was then played for the jury. The prosecutor then continued his closing argument:

"And I ask you that, just that portion of it, does that sound like a guy who says he's so upset he doesn't know what he's doing? He knows exactly, he told him I've gotta go get rid of him. His thoughts are clear when he talked to Blackman, we've got the tape. If you need to listen to that one time, two times or 10,000 times, tell the judge and we'll have it there for you to listen to because that and Beth Ann Ashley and Lisa Frank and Richard Blackman are the telling evidence of why not only Michael Kraus, but Mr. Rivera and Mr. Eaton are guilty, too. *If you want to discuss plea bargainings with me afterwards, please after you're done with your deliberation and decide the case and find the defendant guilty, come over to my office so we can discuss everything about that.* Thank you." (Emphasis added.)

Kraus' argument that the prosecutor argued outside the evidence can be broken down into three parts. First, Kraus argues that it was improper for the prosecutor to invite the jury to come to his office to discuss the case with him after the trial. Second, Kraus argues that it was improper for the prosecutor to tell the jury that the only way to get charged with a crime is to do something. Last, Kraus argues that it was improper for the prosecutor to imply that there was evidence that the jury should have been aware of surrounding Eaton's and Rivera's plea bargains but which was not presented at trial. We will address each of these issues separately.

Kraus argues that when the prosecutor offered the jury to "come back and tell me over in my office after this is all over how does Eaton save his skin" that the prosecutor was essentially telling the jury that "no one can tell me that Eaton is saving his skin." When the statement is set against the whole of the record, the remark is somewhat innocuous. Essentially, the prosecutor is admitting that Eaton received a plea bargain but arguing that Eaton still received a prison sentence for his crimes. That evidence was adduced at trial and was before the jury. The prosecutor's remark appears to be in response to Kraus' argument during closing that Eaton and Rivera got such a good plea bargain that they turned on Kraus. During Kraus' closing argument, counsel stated:

"The district attorney says to you ignore the fact that it's Michael Kraus, it's not Michael Kraus against Danny Eaton, it's these three people against the poor victim. I agree that it's Andrew Rivera and Danny Eaton against this poor victim. But the minute the prosecution gives them a plea bargain of such a magnitude that they go almost 80 years in difference in the time before they're eligible for parole, that's exactly what happens. That's exactly what happens. You pit a co-defendant against Michael Kraus and then you say, oh, it's really not about that. Well, yes it is if you give them that kind of a plea bargain and you ask them to come in here and testify and point a finger at a man for murdering someone when he was not present. That's exactly what happens."

The prosecutor's remark about Eaton's plea bargain was not outside the considerable latitude given a prosecutor during closing argument; therefore, the first prong to the prosecutorial miscon-

duct test is not satisfied. In addition, there was no objection and thus no error.

Kraus next argues that the prosecutor committed misconduct when it intimated that the only people who are charged with crimes are those who "do something." Kraus argues that the prosecutor's remark shifted the burden of proof and created a "presumption of guilt." The implication is, according to Kraus, that since he was charged with a crime, he must have done something. Kraus, however, has taken the comment out of context. The prosecutor was obviously attempting to explain why Ashley was not charged with anything—because she did nothing. It would be an incredible stretch to read the prosecutor's remark as applying to Kraus or attempting to alter or shift the burden of proof. This argument is without merit.

Kraus finally argues that it was improper for the prosecutor to ask the jurors to come to his office after the trial so that they "can discuss everything about plea bargains." As noted earlier, there was evidence before the jury that both Eaton and Rivera agreed to a plea bargain and, in turn, testified against Kraus. The prosecutor's remark was in response to Kraus' assertion that Eaton's and Rivera's testimony may have been motivated by the deal they made with the State.

The invitation to come to the prosecutor's office was improper. However, it was not objected to and, thus, we will not consider the issue.

Affirmed.