(196 P.3d 949)
No. 98,403

STATE OF KANSAS, *Appellee,* v. TYRONE LEAPER, *Appellant.*

Opinion filed December 5, 2008.

*Sarah Morrison* and *Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Jerome A. Gorman*, district attorney, and *Stephen N. Six*, attorney general, for appellee.

Before MALONE, P.J., ELLIOTT and MARQUARDT, JJ.

MARQUARDT, J.: Tyrone Leaper appeals his conviction for second-degree murder and his sentence of 620 months' imprisonment. We affirm.

On May 12, 2006, Leaper went to his sister Erica's apartment. Leaper's brother, Roderick, and Christopher Lovitch, Roderick's girlfriend's brother, were sitting on the stairs outside Erica's apartment.

When Leaper walked by Roderick and Lovitch, Lovitch said Leaper was "in violation" and started a fight with Leaper. The fighting continued and ended up on Georgetta Laster's porch. Laster told the men to get off of her porch and then she called the police. The two men separated, and Leaper went inside Erica's apartment to take care of his bleeding eye.

Leaper testified that when he went outside again, Lovitch jumped on him. The two began fighting again. Then Leaper's cousin, Travis, arrived. Laster watched the fight from her window and testified that Leaper came out of the house with a pole and attempted to attack Lovitch. Laster noticed that one of Leaper's eyes was swollen shut. Leaper testified that he was attempting to walk away.

Laster testified that she was on the phone with police when she heard a gunshot. Laster's son, Ismail Markhal Hill, testified that

he saw Leaper shoot a gun. Nina Jensen, Laster's mother, also testified that Leaper shot the gun.

Leaper denied shooting Lovitch and testified that during the fight, Lovitch was slamming him against the apartment. He heard the gunshot only as his vision came back. Leaper testified that a male named Mike was there and he had a gun.

Roderick testified that Travis had a gun. He testified that he walked into Erica's apartment and was on the phone with Lovitch's sister, Misty Murphy, when he heard the gunshot. He testified that he did not see who shot the gun. Further, Roderick testified that when he went into the apartment to use the phone, Leaper was on the ground next to the neighbor's house. Roderick testified that he turned around and saw Lovitch coming inside and noticed he was shot. However, Roderick's testimony was inconsistent with Murphy's testimony. Murphy testified that Roderick told her, "Tyrone shot your brother." Roderick never mentioned Travis to the detectives, but he did say that he saw Leaper walking towards the hill.

An autopsy revealed that Lovitch died from a gunshot wound to the chest that hit him at an angle. Officer Bruce Cobbins of the Kansas City Police Department testified that Lovitch was inside the apartment with the screen door shut when he was shot. Officer Cobbins testified that the shooter must have stood at a location higher than the door. The gun used in the shooting was never recovered. Nonetheless, Officer Cobbins believed the physical evidence was consistent with the witnesses' statements.

After Roderick testified during trial that Travis was the only person with a gun, the State played the tape of Roderick's earlier interview with police and noted that Roderick did not mention Travis in the tape. The State moved to admit the tape.

Defense counsel objected to admission of the tape, arguing that Roderick was testifying differently at trial than he did in his statement to the police. The district court allowed the State to put into evidence only the portion of the tape that could impeach Roderick's trial testimony. The district court allowed the State to ask Roderick about specific statements he made.

The State asked Roderick if he remembered telling detectives about Leaper being up on the hill when he heard the shot. When Roderick again gave conflicting testimony, the State again offered the entire tape into evidence. The State argued that it was important for the jury to hear the discrepancies between Roderick's statements on the tape and his testimony. The district court took the motion under advisement.

At the end of the day, the judge released the jury and requested a copy of Roderick's statement and the tape. The State was unable to find the tape and questioned whether Roderick took it. The bailiff notified the district court and the parties that a juror told him that Roderick took the tape and put it in his pocket as he left the witness stand. The parties questioned Roderick about the whereabouts of the tape and a deputy searched him. The tape was never found.

The next morning, Leaper filed a motion for a mistrial, arguing that since the tape was missing, there would be uncertainty about Roderick's testimony. He argued that at the very least, he should have an opportunity to question the juror to find out what he or she saw and determine if other jurors saw Roderick take the tape. The district court denied Leaper's motion and stated that the jury has a duty to determine credibility of witnesses. Further, the district court noted that although a juror stated he or she saw Roderick take the tape, it is not uncommon for witnesses to take exhibits. The district court also denied the State's motion to have the tape admitted because the tape was missing.

At the end of the trial, Leaper filed a motion for a new trial arguing, among other things, that the juror witnessing Roderick taking the tape affected his case. The State responded that Roderick's taking of the tape was part of his demeanor and the jury could consider it just like any other demeanor evidence. The district court denied Leaper's motion for a new trial, stating it had already provided its reasons and had determined that no prejudice occurred.

The jury convicted Leaper of second-degree murder and sentenced him to 620 months' imprisonment. Leaper timely appeals.

## I. Motions for a Mistrial and for a New Trial

On appeal, Leaper raises the same arguments that he raised in his motions for a mistrial and for a new trial.

A motion for mistrial and/or a new trial is reviewed under an abuse of discretion standard, and the party alleging the abuse bears the burden of proving that his or her substantial rights to a fair trial were prejudiced. *State v. Albright*, 283 Kan. 418, 425-26, 153 P.3d 497 (2007). Under K.S.A. 22-3423(c), a district court may order a mistrial at any time if prejudicial conduct, inside or outside the courtroom, makes it impossible to proceed without injustice to either party. Juror misconduct will not be a ground for mistrial, however, unless the party claiming error shows that such error substantially prejudiced his or her rights. *State v. Wimbley*, 271 Kan. 843, 851-52, 26 P.3d 657 (2001).

"A high degree of appellate deference is allowed a trial judge's exercise of discretion in assessing the texture and feel of the trial, the credibility of witnesses, and the perceived impact of an allegedly prejudicial event. In these circumstances, appellate decisions often recognize a presumption of validity in the exercise of discretion because of the superior vantage point of the trial judge. The judge's decision will be affirmed even though the appellate tribunal might otherwise be inclined to take a precisely opposite view of the matter." *Saucedo v. Winger*, 252 Kan. 718, 731, 850 P.2d 908 (1993).

There is no Kansas case dealing with the issue of whether a juror observing a witness taking evidence from the witness stand constitutes misconduct. However, there are cases in Kansas dealing with juror misconduct which indicate that the juror's observation in Leaper's case was not misconduct. Juror misconduct usually involves a juror engaging in conversation with third parties, instigating his or her own investigation into the facts of the case, or consulting outside materials to obtain an understanding of key issues of the case; not one where a juror observes a witness' behavior during trial.

In *Saucedo*, a wife initiated a medical malpractice case against a doctor after her husband died from cardiac arrhythmia. After a verdict for the defendant, the plaintiff alerted the district court judge to the fact that jurors admitted misconduct during deliberations. One juror spoke with his daughter about the plaintiff's son's

ability to speak Spanish, which was an issue in the case, while another juror told members of the jury that the victim's uncle was a cocaine dealer and speculated that he died of a cocaine overdose. The district court found the statements constituted misconduct but also believed the misconduct did not substantially affect the jury's determination regarding the cause of the victim's death. Our Supreme Court found the jurors' actions constituted misconduct and the jury violated its oath when discussing the case with nonjurors. The court stated:

"A party is denied the right to a fair trial when a juror introduces evidence on material issues of fact to the jury during its deliberations. Plaintiff did not receive a fair trial because, under the facts of this case, the two incidents of jury misconduct introduced *extraneous* evidence during jury deliberations which had a substantial effect upon the issues and the validity of the verdict." (Emphasis added.) 252 Kan. at 733.

In *State v. Garza*, 26 Kan. App. 2d 426, 429, 991 P.2d 905, *rev. denied* 267 Kan. 890, *cert. denied* 528 U.S. 929 (1999), a defendant alleged juror misconduct when an advance sheet was left in the jury room and tabbed to a case directly on point, and the jurors admitted to reading and discussing the case. This court held that the reading of the case constituted misconduct and the fact that the case explained the legal process demonstrated that the misconduct was prejudicial. This court found it particularly grievous that the district court left the advance sheet in the jury room, rather than the jurors themselves "[finding] *extrinsic* legal materials and read[ing] through them." (Emphasis added.) 26 Kan. App. 2d at 430-31.

Roderick's actions and testimony were not extrinsic evidence. His actions and testimony were capable of being observed by the entire jury. This was not an act of a juror.

On the other hand, in *State v. Everson*, 229 Kan. 540, 543, 626 P.2d 1189 (1981), the victim, who was on the witness stand in the middle of cross-examination, began crying when the district court announced that it would adjourn for the day. The Kansas Supreme Court found that there was no proof of substantial prejudice to the appellant and held that the district court did not abuse its discretion in denying defendant's motion for a mistrial.

In *State v. Chears*, 231 Kan. 161, 165-66, 643 P.2d 154 (1982), the defendant requested a mistrial after a child witness cried and sobbed on the witness stand. The district court denied the motion, stating it did not observe the crying. The Kansas Supreme Court affirmed and held that the district court is in the best position to observe the demeanor of witnesses and determine whether the accused sustained substantial prejudice. 231 Kan. at 166.

The facts in Leaper's case are similar to those in the *Everson* and *Chears* cases, where our Supreme Court found that the behavior of a witness on the stand was a part of the witness' demeanor and did not cause the defendant prejudice. Here, the jury observed Roderick's actions during trial. Unlike *Saucedo* and *Garza*, where jurors engaged in behavior outside the courtroom, the juror here observed a witness during the trial.

Unlike the juries in *Saucedo* and *Garza*, the jury in Leaper's case was not influenced by extrinsic evidence, but was considering the witness' demeanor. "[T]he credibility of a witness is a question for the jury, to be weighed and decided after the jury observes the demeanor of the witness at the trial of the accused." *State v. Holloway*, 219 Kan. 245, 253, 547 P.2d 741 (1976). "Demeanor" is defined as "[o]utward appearance *or behavior*," and "demeanor evidence" is "[t]he *behavior* and appearance of a witness on the witness stand, to be considered by the fact-finder on the issue of credibility." (Emphasis added.) Black's Law Dictionary 463, 596 (8th ed. 2004). On the other hand, "extrinsic evidence" is defined as "[e]vidence that is not legitimately before the court." Black's Law Dictionary 597 (8th ed. 2004). These definitions make clear that the juror considered Roderick's behavior as demeanor evidence, like the evidence in *Everson* and *Chears*, and not as extrinsic evidence, like the evidence in *Saucedo* and *Garza*.

It is not misconduct for a juror to observe the behavior of a witness on the witness stand; that very observation is required of the juror to make a credibility assessment of the witness. Further, all jurors may observe the same or different behaviors of the witnesses in assessing credibility. Therefore, absent a showing of misconduct by a juror, Leaper cannot demonstrate that his rights were

substantially prejudiced, and this court is not required to conduct further analysis.

Although Leaper argues that this court cannot determine whether his rights were prejudiced without a hearing to fully investigate and question the juror, our Supreme Court has held, when considering communications between jurors and third parties, district courts have discretion in determining whether to question jurors regarding such communications. *State v. Overton*, 279 Kan, 547, 557, 112 P.3d 244 (2005). This court cannot find an abuse of discretion by the district court for failing to investigate actions that did not constitute misconduct. See *State v. Albright*, 273 Kan. 811, 825-26, 46 P.3d 1167, *cert. denied* 537 U.S. 962 (2002). The district court did not abuse its discretion for failing to question the juror.

Finally, Leaper fails to show how the juror's observation of Roderick was relevant to his trial, or how it would have affected the outcome of his trial. The evidence against Leaper was overwhelming, considering that he was engaged in a physical fight with Lovitch moments before his death, and neighbors identified Leaper as the shooter. Further, Cobbins found the neighbors' statements consistent with the physical evidence.

Although Roderick attempted to testify at trial that Travis was the shooter, he admitted that he never told the police about Travis when they interviewed him on the day of the shooting. The tape was played for Roderick during a trial break because he claimed that he could not read the transcript of his statement to the police. The jury did not hear the tape.

The actions by Roderick in taking the tape would only have contributed to his already negative demeanor and weak credibility. Thus, the action was not only irrelevant to Leaper's case, it was insignificant compared to the evidence at trial and Roderick's previous testimony.

Because there was no juror misconduct, we find that the district court did not abuse its discretion in denying Leaper's motions for a mistrial and a new trial.

## II. Use of Tape of Telephone Conversations and their Transcripts

Before trial, the State filed a motion to determine the admissibility of Leaper's recorded and transcribed phone calls made while he was in custody in the Wyandotte County jail. The motion was heard prior to trial, and the district court stated that it needed to review the statements before determining their probative value. There is nothing else in the record on appeal regarding this issue.

At trial, Captain James Eickhoff of the Wyandotte County Sheriff's Department testified that inmates are assigned PIN numbers when they are booked into jail so the sheriff can track their phone calls. Captain Eickhoff testified that inmates are notified before making a call that the call may be taped. There are signs posted in the calling areas saying that calls are subject to monitoring and recording. Eickhoff had provided the State with copies of calls made by Leaper. The State played the tape of the calls, and the tape was admitted into evidence as Exhibit 22 without objection.

During the phone calls, Leaper made the following statements:

1. "Travis wadn't [*sic*] even there."
2. "All they need to do keep they mouth closed, you know what I'm saying?"
3. "The only thing that really got me in here is that stuff that lady said, she seen me shoot. That's the only thing that got me here. If y'all go talk to her and she shut her mouth, I can come—I can be home if she can go up there and tell them she said the wrong thing, that they got the wrong person or somethin'. If y'all can get her to say that, I can come home tomorrow."
4. "[T]he lady across the street supposed to be going to court on me and if she show up for court, I'll be in here till whenever, I don't know."

During jury deliberations, the jury requested "a print out of the phone conversations from jail." The response from the district court was "Yes." Leaper made no objection to this request, and there is no additional information regarding this request in the record on appeal.

The jury also requested to "hear the transcrip[t] from the jail phone conversations." The district court, after noting that the sound quality of the recording was poor, stated "[t]hat's why they have the screen so that you can read what they're saying as you listen to the transcript." The State again played Exhibit 22 for the

jury, and Leaper, his counsel, and the prosecutor were present. Then the district court stated, "That concludes the jail conversations and the transcript. The bailiff will escort you back to the jury deliberation room . . . ." Again, nothing in the record on appeal shows that Leaper objected to this request.

The record on appeal contains the certified court reporter's transcribed versions of the phone conversations Leaper made from the Wyandotte County jail.

Leaper argues that the district court abused its discretion by failing to instruct the jury that the transcripts were not evidence and by allowing the jury access to the transcripts. Leaper argues that the district court's actions were contrary to the requirements in *State v. Kraus*, 271 Kan. 810, 26 P.3d 636 (2001). Leaper failed to object to use of the transcripts at trial or their use during deliberations. There is nothing in the record on appeal that indicates the jury was allowed to take the transcripts into the jury room, and Leaper fails to show how the use of the transcripts prejudiced his case, which was the concern in *Kraus*.

A district court possesses wide discretion in determining whether to allow the jury to use written transcripts as aids in listening to audiotape recordings. *Kraus*, 271 Kan. at 812. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *State v. Reed*, 282 Kan. 272, 280, 144 P.3d 677 (2006). The party alleging an abuse of discretion bears the burden of showing such abuse. *Kraus*, 271 Kan. at 813.

Generally, a party cannot raise an issue on appeal where no contemporaneous objection was made and where the district court had no opportunity to rule. *State v. Kirtdoll*, 281 Kan. 1138, 1148, 136 P.3d 417 (2006). A defendant waives the right to challenge the district court's response to a jury request by failing to object. *State v. Smith*, 258 Kan. 321, 327, 904 P.2d 999 (1995). Because Leaper failed to object to the use of the transcripts at trial and during deliberations, we find that Leaper waived his right to challenge the district court's use of the transcripts in both instances.

Finally, Leaper has not provided any insight as to how the audio recording or the transcripts prejudiced his trial. The only argument Leaper makes is that the jury gave the transcripts and audio recording consideration during deliberations. This is not evidence of prejudice.

### III. Cumulative Error

Leaper argues that the trial errors, if deemed harmless individually, are prejudicial when considered cumulatively. The State argues that no trial errors were committed.

" 'Cumulative trial errors, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under the cumulative effect rule if the evidence is overwhelming against a defendant. [Citation omitted.]' " *State v. Nguyen*, 285 Kan. 418, 437, 172 P.3d 1165 (2007).

One error is insufficient to support reversal under the cumulative effect rule, and cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant. *Nguyen*, 285 Kan. at 437; *State v. Davis*, 283 Kan. 569, 583, 158 P.3d 317 (2007).

Because we have determined that the district court did not commit trial errors, there is no cumulative error.

### IV. Sentencing

Leaper argues that the district court erred by increasing his sentence based on his criminal history without first submitting and proving his criminal history to a jury beyond a reasonable doubt. The presentence investigation report showed that Leaper had a criminal history score of A. Leaper did not object to the presentence investigation report, and the district court subsequently sentenced him pursuant to his criminal history score.

Our Supreme Court already decided this issue in *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 (2002). Moreover, our Supreme Court recently evaluated *Ivory*, did not find reason to alter the decision, and still concluded that the use of prior convictions to increase a sentence is constitutional. *State v. Gonzalez*, 282 Kan. 73, 118, 145 P.3d 18 (2006). Absent some indication the Kansas

Supreme Court is departing from its holding in *Ivory*, this court is bound to follow the precedent. See *State v. Merrills*, 37 Kan. App. 2d 81, 83, 149 P.3d 869, *rev. denied* 284 Kan. 949 (2007).

Affirmed.

MALONE, J., concurring: I respectfully concur in the result, but I am unable to agree with the majority's analysis on the "missing cassette tape" issue. I conclude the district court abused its discretion by not questioning the juror who reported that Roderick Leaper took the cassette tape and put it in his pocket as he left the witness stand. However, I do not believe this error affected the outcome of Tyrone Leaper's trial.

The facts are unusual. Roderick Leaper, the defendant's brother, testified at trial that his cousin, Travis, was the only person with a gun on the night of the shooting. To impeach this testimony, the State, in the presence of the jury, moved to admit into evidence a cassette tape of Roderick's prior statement to the police in which Roderick did not mention anything about Travis having a gun. Defense counsel objected and the district court took the motion under advisement. Later, when the judge wanted to listen to the cassette tape, it was discovered missing. The bailiff notified the judge that a juror reported that Roderick took the cassette tape and put it in his pocket as he left the witness stand. Roderick was questioned about the whereabouts of the tape, and a deputy searched him, but the tape was never found.

As a result of these developments, Leaper moved for a mistrial *or in the alternative* Leaper requested the court to question the juror to learn what the juror witnessed and whether other jurors saw Roderick take the tape. The State argued that Roderick's action was part of his demeanor and the jury could use anything they saw from him on the witness stand to judge his credibility. The district court denied Leaper's motion in its entirety and stated that the jury had a duty to determine the credibility of witnesses. The district court rejected Leaper's argument that he might be prejudiced by the fact that a juror saw his brother take an exhibit from the courtroom. According to the district court, it was not an uncommon occurrence for a witness to walk out of the courtroom with a piece

of evidence. After the trial, Leaper renewed his arguments in a motion for a new trial which was denied by the district court.

The majority analyzes the issue in terms of juror misconduct and concludes that no juror misconduct was committed. However, juror misconduct is not the issue. Leaper's motion for new trial did not even allege juror misconduct. Leaper's primary argument is that prejudicial conduct which occurred in the courtroom made it impossible for him to receive a fair trial.

The majority agrees with the State that even if a juror saw Roderick put the cassette tape in his pocket as he left the witness stand, this was simply part of the witness' demeanor which could be considered by the jury in judging credibility. On this point, I disagree. "Demeanor" is defined as "[o]utward appearance or behavior, such as facial expressions, tone of voice, gestures, and the hesitation or readiness to answer questions"; "demeanor evidence" is "[t]he behavior and appearance of a witness *on the witness stand,* to be considered by the fact-finder on the issue of credibility." (Emphasis added.) Black's Law Dictionary 463, 596 (8th ed. 2004).

Here, a juror reported that Roderick took the cassette tape and put it in his pocket *as he left the witness stand,* after he had completed his testimony. The fact that a juror may have observed Roderick take an exhibit as he left the courtroom does not fall within the definition of witness demeanor. Rather, this was extrinsic evidence that was not legitimately before the factfinder. Leaper may well have been prejudiced by the fact that a juror saw his brother take the exhibit. The juror apparently realized this behavior was improper or else the juror would have never reported the conduct to the bailiff in the first place.

If, in fact, a juror saw Roderick take the cassette tape and put it in his pocket as he left the witness stand, the juror should have been instructed to disregard this conduct in deciding Leaper's guilt or innocence of second-degree murder. Under the unusual circumstances presented in this case, I conclude the district court abused its discretion by not at least questioning the juror to learn what the juror knew about the missing exhibit, how the information affected the juror, and whether the juror shared the information with other members of the jury.

Nevertheless, I do not believe this error affected the outcome of Leaper's trial. The evidence against Leaper was overwhelming, considering that he was engaged in a physical fight with the victim moments before the victim's death and two eyewitnesses identified Leaper as the shooter. Had the cassette tape containing Roderick's prior inconsistent statements been played to the jury, presumably this would have damaged Leaper's case even further. For these reasons, I conclude that Leaper's conviction of second-degree murder should be upheld.