No. 84,615

STATE OF KANSAS, *Appellee*, v. WILL A. WIMBLEY, *Appellant*.

(26 P.3d 657)

Opinion filed July 13, 2001.

*Autumn L. Fox*, of Michael A. Montoya, P.A., of Salina, was on the brief for appellant, and Will A. Wimbley, appellant, was on separate briefs pro se.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Will A. Wimbley appeals from his conviction of premeditated first-degree murder and criminal possession of a firearm in connection with the death of Tina Cooper. He contends that there was insufficient evidence to convict him of premeditated first-degree murder; juror misconduct denied him a fair trial; there was insufficient evidence to convict him of criminal possession of a firearm; the court erred in admitting evidence of his prior discordant relationship with the victim; the search and seizure of evidence from his uncle's house in which he sometimes resided was illegal; and the prosecution improperly commented on his post-*Miranda* silence in closing argument. We affirm.

On February 10, 1999, the body of Tina Cooper, a.k.a Leola Christina Haskins, was found next to a bike path at 12th and Mat-

thewson in Wichita. Her shoes and day planner were near her body, and police found a bloody pillowcase and comforter nearby. DNA testing revealed that the blood was consistent with that of the victim. An autopsy revealed that the victim had suffered several gunshot wounds. Stippling and soot in the wounds indicated that many had been inflicted at very close range. The body also had contusions and abrasions.

Suspicion focused on the defendant, who was the victim's ex-boyfriend. The defendant and the victim had been together for more than 2 years. Their relationship was a discordant one, and police had been called to intervene numerous times when the defendant had beaten her. On one occasion, she told officers that the defendant beat her when she tried to end her relationship with him. The woman who raised the victim, Rosemary Cooper, stated that Tina had decided to move out on her own because if she did not leave the defendant, he would wind up killing her.

At approximately 11:30 p.m. on February 9, the day before the body was found, the defendant's car had been impounded by police because it was parked in the driveway of a residence at 1134 N. Indiana and the resident, who did not know the defendant, wanted it removed. The resident also found a large shirt nearby, which he threw away. The shirt, which had bloodstains on it, was later recovered by police; DNA testing revealed that the blood was consistent with the victim's blood. A gun was also found near 1134 N. Indiana. Testing revealed that the bullets and fragments taken from the victim's body had been fired by that gun.

A warrant was obtained to search the defendant's car, which was parked at the defendant's uncle's house at 1345 N. Indiana, near where the gun and shirt were found. The defendant often stayed with his uncle in the house and had a key. When police arrived to search the car, they asked the defendant's uncle, Anther Wilson, if they could have permission to search the house. Permission was given, and Lieutenant Ken Landwehr entered the house to look for the defendant. While looking for the defendant, Landwehr saw a pillow with a pillowcase matching the one found by the victim's body.

A search warrant was then obtained for the house. Crime scene investigators discovered a spent cartridge case and some faint bloodstains near the steps of the house and another spent cartridge case on the porch. Testing determined that both cartridge cases had come from the gun found earlier. The blood on the sidewalk was consistent with the blood of the victim.

Inside the house, investigators noticed some discolorations on the carpet, which would be consistent with the carpet having been bleached. Three empty one-quart bottles of Clorox bleach were found in the trash can of the house. There was no washing machine in the house. A section of the bleached carpet was cut out and subjected to DNA testing, and it revealed DNA consistent with that of the victim. An empty ammunition holder designed for the type of ammunition used in the shooting of the victim was found in one of the bedrooms. The defendant's fingerprints were found on the ammunition holder. Later, a fingerprint from the defendant was found on the day planner that was near the victim's body.

A woman named Candis Ramirez testified that she stopped by the house at 1345 N. Indiana on the evening of February 9 to buy cocaine and that she bought cocaine from Tina, who was at the house. She came back a few hours later to buy more cocaine and saw the victim's body lying on the steps to the house. Ramirez thought that some of the victim's blood had gotten on her shoe when she walked by the body. DNA testing of the shoe later confirmed that a small drop of the victim's blood was on the shoe.

Paris Andrews, the girlfriend of Anther Wilson, confirmed that the victim was at Anther's house at 1345 N. Indiana on February 9. Andrews stated that she and Wilson left to play bingo a little after 7 p.m. and did not return until after 10 p.m., at which time they played dominoes in the dining room. The victim was not there at that time. While they were playing dominoes, the defendant, accompanied by his friend Eugene Langford, came in and talked to Wilson. Wilson gave the defendant a bottle of bleach, and the defendant began cleaning up something on the floor. The defendant told Andrews that he had vomited earlier and was cleaning it up. The defendant told Wilson and Andrews that his car had stopped running and he needed to borrow Wilson's Jeep.

Andrews told police that after February 9, the defendant dropped from sight. The defendant's next door neighbor testified that the defendant, who normally let his dogs out in the morning and put them back in the evening, did not return to the house after February 9.

Eugene Langford provided an alibi witness for the defendant. Langford testified that he went to 1345 N. Indiana approximately 6 or 7 p.m. to visit the defendant, and that they played a Sony Playstation game for 2 to 3 hours and then drove to a nearby pool hall. When they left the pool hall sometime later, the defendant's car would not start. They managed to get a jump start and drove back towards 1345 N. Indiana. However, the car stalled again, which is why they pushed it into the driveway at 1134 N. Indiana that they thought was vacant. They then walked to 1345 N. Indiana and borrowed Anther Wilson's Jeep. They returned to the pool hall where they stayed until approximately 2 a.m. According to Langford, the defendant could not have killed Tina because the defendant was with him the entire evening.

On the basis of the circumstantial evidence linking him to the murder, as well as a stipulation regarding his prior felony record, the defendant was convicted of premeditated first-degree murder and criminal possession of a firearm.

## Sufficiency of the Evidence for Premeditated First-Degree Murder

The defendant contends that the evidence was insufficient to convict him of premeditated first-degree murder. This argument is raised both in the defendant's appellate counsel's brief, which focuses on premeditation, and in the defendant's pro se briefs, which focus on the evidence tying him to the murder.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999). In order to find that sufficient evidence existed to convict the defendant of premedi-

tated first-degree murder, this court must be convinced that a rational factfinder could have found beyond a reasonable doubt that the defendant intentionally and with premeditation killed Tina. See K.S.A. 21-3401(a).

It is true that the evidence linking the defendant to the murder of Tina is entirely circumstantial. However, we have held that a conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Smith*, 268 Kan. 222, 236, 993 P.2d 1213 (1999). The evidence presented at trial showed that the defendant and the victim had a tumultuous relationship and that the defendant previously had become angry and violent when Tina tried to end the relationship. The bloodstains consistent with the victim's DNA and spent cartridges from the murder weapon that were found at the defendant's uncle's house, as well as the discovery of the murder weapon and a t-shirt bearing the victim's blood near a house where the defendant's car had been parked shortly after the murder, all point to the defendant as the killer. The defendant's fingerprints on a cartridge holder which carried ammunition consistent with that used in the murder weapon and his fingerprint on the day planner found near the body, as well as further evidence tending to show that the defendant attempted to clean up the carpet at the murder scene using bleach and dropped out of sight after the murder, linked the defendant to the crime.

Under the circumstances, this evidence, if believed, would be sufficient for a rational factfinder to have found the defendant guilty of the murder of Tina beyond a reasonable doubt. The question remains whether such evidence is sufficient under our standard of review to establish premeditation.

We have defined premeditation as a " 'state of mind' relating to a person's reasons and motives for acting as he or she did." *State v. Cravatt*, 267 Kan. 314, 328, 979 P.2d 679 (1999). In *State v. Jamison*, 269 Kan. 564, 571-72, 7 P.3d 1204 (2000), we stated:

"Unless a person actually communicates his or her reasons for taking another's life, evidence of premeditation must be proved by circumstantial evidence. . . . Premeditation cannot be inferred from the use of a deadly weapon alone, but it may be inferred where other circumstances also exist. [Citation omitted.]

"The circumstances which may give rise to an inference of premeditation include but are not limited to (1) the nature of the weapon used, (2) a lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and/or declarations made by the defendant before and after the killing, and (5) lethal blows inflicted after the deceased was felled and rendered helpless."

The state of mind of a defendant and whether he or she acted with premeditation is an issue which the law reserves unto the jury, and the jury has the right to infer premeditation from the established circumstances of the case provided the inference is a reasonable one. *State v. Cravatt*, 267 Kan. at 329; *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981 (1997).

We conclude that the evidence was sufficient for a rational fact-finder to have concluded beyond a reasonable doubt that the defendant acted with premeditation. The defendant's past actions with regard to the victim established that he had previously been violent when she tried to leave him, and other evidence showed that she was attempting to make a break from him around the time the murder occurred. The victim expressed fear that the defendant would eventually kill her. The fact that the victim was killed by seven gunshot wounds, many of which were fired at close range, also supports the inference that the defendant acted with premeditation, as does the fact that the defendant's car was parked in a neighboring driveway.

The defendant also argues that this court's definition of premeditation blurs the line between first- and second-degree murder, and that this definition was exacerbated by the State's argument in closing. The trial court instructed the jury that " 'premeditation' means to have thought over the matter beforehand," and denied a requested defense instruction that would have added: "Premeditation means that there was a design or intent before the act; that is, that the accused planned, contrived and schemed beforehand." In closing argument, the prosecutor stated:

"Premeditation requires no specific time period. That's what the law is. It doesn't require any. It doesn't say well, you have to think about it for 30 seconds, or five, or five hours or anything else. Premeditation can occur in an instant. It can be a thought. Just like that (indicating). I can decide to kill anybody in this room and that would be premeditation. That's what the law is. And you swore—you all swore

that you would follow the law, and the law says premeditation can happen just like that."

The defendant's argument is identical to the one made by the defendant in *State v. Jamison*. See 269 Kan. at 572-73. In *Jamison*, we noted that "the statement by the trial court that premeditation means to have thought over the matter beforehand, and there is no particular time element required to establish premeditation, was a correct statement of Kansas law." 269 Kan. at 572. In the case at hand, the trial court's statement was even less troublesome because it omitted the phrase "there is no particular time element required to establish premeditation." Further, with regard to a nearly identical closing argument by the prosecutor in *Jamison*, we held that there was "a very real distinction between the argument of a prosecutor and the instruction of a trial court." 269 Kan. at 573.

## Sufficiency of the Evidence for Criminal Possession of a Firearm

The defendant also argues that the evidence was insufficient to convict him of criminal possession of a firearm. In order to convict the defendant of criminal possession of a firearm, the jury would have had to have found beyond a reasonable doubt that (1) the defendant possessed the firearm and (2) that the defendant had previously been convicted of a person felony. See K.S.A. 2000 Supp. 21-4204(a)(2). The defendant stipulated as to his previous conviction of a person felony. Thus, the only issue for the jury was whether the defendant actually possessed a firearm.

The defendant contends that there is no evidence linking him to the firearm. However, as noted above, there is sufficient circumstantial evidence from which a jury could find beyond a reasonable doubt that the defendant shot and killed the victim. Therefore, without question there was sufficient evidence for a rational juror to find that the defendant did in fact possess the firearm used in the killing.

## Juror Misconduct

The third issue raised by the defendant concerns juror misconduct which allegedly occurred on the first day of the trial. The

defendant contends that this misconduct was so severe that the trial court had a duty *sua sponte* to declare a mistrial in order to protect the defendant's rights.

In order to properly frame this issue, it is necessary to examine the facts surrounding the alleged misconduct in some detail. The juror in question was B.X., who was originally from Laos. After voir dire, the State attempted to use a peremptory strike on B.X., but a *Batson* challenge was raised and she remained on the jury. During voir dire, both the State and the defendant asked the prospective jurors whether they or anyone they knew had been a victim of domestic violence. B.X. remained silent throughout such questioning.

During a recess on the first day of trial, however, jurors informed the trial court that B.X. had confided to them that she was currently a victim of domestic violence by her husband. The trial court immediately questioned B.X. and the other jurors individually.

B.X. told the court that when one of the other jurors jokingly asked how her husband got to be a "home husband," she began crying and told him that she was a victim of domestic violence. She admitted that she did not say anything during voir dire because the situation was too personal. B.X. stated that she cried for 4 or 5 minutes in the jury room. Following this testimony, B.X. was dismissed from the jury.

The trial court then interviewed the jurors. All of them indicated that B.X.'s story would not affect their ability to be impartial.

At the close of the interviews, the trial court asked if there were any motions. Defense counsel then stated:

"Your Honor, I have spoken to my client both before we began this selection— not selection, I'm sorry, this inquiry and after hearing the responses to the questions posed, and my client has advised me, and I'm inclined to agree, we will not be making a motion at this time for a mistrial."

The defendant now claims that notwithstanding his decision not to seek a mistrial, the trial court should have declared a mistrial *sua sponte*.

K.S.A. 22-3423(c) and (e) provide that a trial court may declare a mistrial at any time due to prejudicial conduct, in or outside the

courtroom, which makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution, or where false statements of a juror on voir dire prevent a fair trial. The declaration of a mistrial is a matter within the discretion of the trial court and will not be disturbed absent a showing of abuse of that discretion. *State v. Rinck*, 256 Kan. 848, 853, 888 P.2d 845 (1995). Juror misconduct is not a ground for reversal, new trial, or mistrial unless it is shown by the party claiming error to have substantially prejudiced his or her rights. *State v. Fulton*, 269 Kan. 835, 840, 9 P.3d 18 (2000).

The defendant contends that his rights were prejudiced because the prosecution's case heavily relied on domestic violence to show motive and premeditation. He contends that B.X.'s description of her own domestic problems could not have helped but influence the jury to his detriment.

However, as shown by the trial court's questioning of the jurors, each of the jurors indicated that the incident would not affect his or her ability to be impartial. None of the jurors indicated that B.X.'s statements affected them to any great extent. We note that the defendant advised the trial court that he did not want a mistrial. This is not a case where the defendant and his counsel simply failed to request a mistrial. Rather, the trial court gave the defendant every opportunity to do so. Instead, the defendant and his counsel made a tactical decision to refuse to request a mistrial. A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal. *State v. Saleem*, 267 Kan. 100, 109, 977 P.2d 921 (1999).

Based on the facts of this case, we hold that the trial court did not abuse its discretion in failing *sua sponte* to declare a mistrial.

## Admission of Evidence of a Discordant Relationship

The defendant contends that the trial court erred in admitting evidence of his prior discordant relationship with the victim. He argues that the evidence was not relevant and, therefore, more prejudicial than probative.

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion, but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

However, the trial court admitted the evidence on the theory that it was admissible independent of K.S.A. 60-455 to show the nature of the ongoing relationship between the defendant and the victim. We have held that evidence of prior acts of a similar nature between the same parties is admissible independent of K.S.A. 60-455 where the evidence is not offered for the purpose of proving distinct offenses but rather to establish the relationship of the parties or the existence of a continuing course of conduct between the parties, or to corroborate the testimony of the complaining witness as to the act charged. *State v. Lumley*, 266 Kan. 939, 954, 976 P.2d 486 (1999); *State v. Carr*, 265 Kan. 608, 624, 963 P.2d 421 (1998).

Where evidence is admissible independent of K.S.A. 60-455, the primary test for its admission is its relevancy to the issue in question. *State v. Sexton*, 256 Kan. 344, 349, 886 P.2d 811 (1994). Relevancy is more a matter of logic and experience than of law. Evidence is relevant if it renders the desired inference more probable than it would be without the evidence or if it has any tendency in reason to prove any material fact. 256 Kan. at 349. The admission of evidence independent of K.S.A. 60-455 is entrusted to the sound discretion of the trial court and will not be overturned absent a clear showing of abuse of that discretion. 256 Kan. at 350.

The ongoing relationship between the defendant and the victim was relevant to show the ongoing violent relationship between the parties and renders the inference that the defendant, having once before beaten Tina when she discussed leaving him, and having acted violently toward her in the past, killed her when she contemplated making a final break from him. The trial court did not abuse its discretion in admitting the evidence.

### The Search and Seizure of Evidence from Anther Wilson's House

The defendant argues that the search and seizure of items from Anther Wilson's house was illegal and that the trial court erred in failing to grant his motion to suppress such evidence. While he properly cites the law applicable to search and seizure, he gives no reasons as to why he believes the search and seizure was illegal. The trial court found that the consent to search given by Anther Wilson was sufficient to provide authority for a walk through of the residence and that once a pillowcase matching the one found by the body was found in plain sight in the residence, along with other evidence, there was sufficient cause for a search warrant to be issued. The residence was then searched pursuant to this search warrant which the trial court found to be valid. Under the circumstances, the defendant has not shown that the search and seizure was illegal.

### Prosecutorial Misconduct

The defendant's final argument is that the prosecutor in this case committed misconduct in closing argument by improperly commenting on the defendant's post-*Miranda* silence. The defendant does not identify any conduct or statement of the prosecutor. However, there was one comment of the prosecutor that fits within the defendant's allegation.

During his closing comments regarding the defendant's car being parked in the driveway, the prosecutor mentioned that the defendant had told one witness that he was going to go back to his car to try and fix it, but that police were on the scene when he drove by. The prosecutor then stated: "Well, Mr. Innocent, why didn't you just go up to the police and say, 'Hey, my car stalled out'?" Defense counsel objected to the questioning nature of the remark. The trial court directed the prosecutor to remain at the lectern and not look at the defendant during closing. The prosecutor then amended his comment, stating: "Why doesn't Will Wimbley just go up to the police and say 'My car stalled out'?"

The defendant attempts to characterize the prosecutor's question as an improper comment on his post-*Miranda* silence. However, the prosecutor's statement does not fit within that character-

ization. The import of the prosecutor's question was that the defendant did not speak out to police when he had the chance prior to his arrest, not that he failed to speak out post-*Miranda*. The defendant is not arguing that the prosecutor commented on his post-*Miranda* silence as much as that his questioning comment during closing argument itself violated the defendant's *Miranda* rights. The question itself was rhetorical and not designed to elicit an answer. Under the circumstances, we find no prosecutorial misconduct.

Affirmed.