No. 85,599

STATE OF KANSAS, *Appellee*, v. ARTHUR R. ALBRIGHT, *Appellant.*

(46 P.3d 1167)

Opinion filed May 31, 2002.

*Rebecca E. Woodman,* assistant appellate defender, argued the cause, and *Steven R. Zinn,* deputy appellate defender, was with her on the briefs for appellant.

*Debra S. Peterson,* assistant district attorney, argued the cause and *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

Six, J.: Defendant Arthur Albright appeals his premeditated first-degree murder conviction and his hard 40 sentence. K.S.A. 21-3401(a); K.S.A. 2001 Supp. 21-4635(c); K.S.A. 2001 Supp. 21-4638.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (conviction for an off-grid crime).

The issues are whether: (1) the prosecutor committed misconduct during closing argument, and (2) the district court abused its discretion by: (a) admitting cross-examination evidence of Albright's prior bad acts and (b) denying Albright's motion to recall the jury.

Albright also questions the constitutionality of his hard 40 sentence and the constitutionality of K.S.A. 22-3220 (defense of lack of mental state). Neither constitutional claim was raised below. The challenge to the hard 40 sentence is based on *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Albright's trial commenced on May 15, 2000. The guilty verdict was returned on May 18, 2000. *Apprendi* was filed June 26, 2000. Albright's hard 40 claim is controlled by *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). Albright urges us to overrule *Conley*. We decline to do so.

Albright's claim of unconstitutionality leveled at K.S.A. 22-3220 is not linked to *Apprendi*. We find no compelling reason to reach the K.S.A. 22-3320 constitutional question in this opinion.

Finding no reversible error, we affirm.

## FACTS

Around 1:30 p.m. on Friday, January 29, 1999, Calvin Flanders met Lucille Noelle Weeden, the victim, at her job appointment in Wichita. He was in his red truck. They drove to pick up her paycheck, then on to a pawnshop, where she retrieved a ring and a "boom box." Weeden lived in an apartment house. Albright lived in the same house, in a different apartment. When Flanders took Weeden home, he saw Albright standing on the front porch. Flanders lost sight of Weeden as he drove away. She was about two steps past Albright when he last saw her.

Around 2:15 that afternoon, Latashia Hankins was sitting in front of her window in the house next door. She saw Weeden exit from a red truck. A short time later, Hankins heard a lady cry or scream. The sound came from the south, where Weeden's apartment was located. Moments later, Hankins saw Albright walking north past her house. He had a tan jacket across his left arm and held his right arm near his stomach. Hankins testified that Albright's hair "was all over his head" and there was blood on the sleeve of his jacket. She said he was "moving kind of fast." Hankins lost sight of Albright as he headed west on Orme Street.

While driving north on Broadway, Pamela Finstad saw Albright at the corner of Broadway and Orme Street. Albright's hair was

messed up, his shirt was untucked, and he seemed to be in a hurry. Findstad testified that Albright appeared to carry a "bundle of something."

Finstad lived in the same apartment house as Weeden and Albright. As she approached the front door, she saw a body in the entryway. She testified that it looked like somebody had just "degutted a person." Finstad told her husband Norman what she had seen. Norman recognized Weeden's body. Keys were hanging in the door to Weeden's apartment. A boom box and glasses lay near by. The door leading upstairs to Albright's apartment was open 4 to 6 inches. Police found a trail of blood from Weeden's porch to the intersection of Broadway and Orme.

Forensic experts concluded that Weeden sustained more than thirty stab wounds to her internal organs resulting from multiple movements involving significant force. When presented for autopsy, some of Weeden's small bowel was outside the abdominal cavity. Weeden's injuries were consistent with the insertion of a small knife and hand into the body. There were defensive wounds on her hands. According to a forensic pathologist, Weeden was conscious during the attack, but the pathologist could not determine for how long. Weeden's hands were smeared with blood and brown fecal-looking matter.

Two days after the murder, Albright was found in the area near a drainage ditch. He wore dark gloves covered with blood and dirt, a dirty tan jacket, bloody jeans, tennis shoes, and a dark cap. Police found a small pocket knife in one of his pockets. When Albright's gloves were removed, police discovered a rather large laceration on the middle of his right hand and on his right index finger. At different times, he told police and medical personnel that he had been cut with a knife on Friday night or that his injuries were caused by a fishing hook. He told police that he was fishing. However, he had no fishing equipment. He also told police that his name was Ron D. Sanson. He gave various social security numbers and was evasive about his address. He carried a Kansas identification card bearing his name. Albright was taken to a hospital, where he gave his correct name.

The measurement of one stab wound to Weeden's liver was consistent with Albright's knife. A forensic expert determined that it was the largest blade on the pocket knife that left marks on Weeden's breastplate tissue. A DNA analysis revealed profiles consistent with a blood contribution by both Albright and Weeden on Albright's jacket, his pocket knife, and on Weeden's jeans, jacket, and fingernails. Blood from the blood trail was also consistent with Albright's DNA profile.

Before trial, Albright filed a notice of intent to rely on a defense of diminished capacity or insanity. The district court ordered a competency determination in June 1999. In October 1999, Albright was found to be incompetent to stand trial and was ordered to be committed to Larned State Security Hospital (Larned) for treatment. A second motion to determine competency was filed in April 2000. Albright was found competent to stand trial.

At trial, the defense presented the testimony of Dr. William Logan, a forensic psychiatrist. Dr. Logan was retained to determine whether Albright was competent to stand trial and to render an opinion concerning Albright's mental state at the time of the murder. He testified that Albright was suffering from "schizophrenia, a paranoid type, that . . . had been widely reflected in [Albright's] records going back over 20 years." There were periods of time where Albright was both medicated and hospitalized. At one point, he was kept in a hospital for as long as 7 years. According to Dr. Logan, paranoid schizophrenia is probably "one of the . . . more severe mental illnesses that you can have. It's characterized by hallucinations or in some individuals a strong preoccupation with illusion." Dr. Logan testified that in recent years, Albright had developed the idea that people were coming into his apartment and tampering with things or taking things.

Regarding Albright's mental condition at the time of the offense, Dr. Logan opined that Albright, who was not taking medication, was psychotic, suffering from paranoid schizophrenia, delusional, and paranoid. According to Dr. Logan, Albright could not think rationally about things that were going on around him; rather, "he would see them only in light of the preconceived ideas that people were purposely harassing him; he was being threatened." Dr. Lo-

gan indicated that Albright's mental condition affected his ability to reason and think rationally at the time of the offense.

On rebuttal, the State presented the testimony of Dr. William Levine, a psychiatrist. In Dr. Levine's opinion, "[T]he way in which the assault was carried out could only have happened with a person intending to assault somebody. It wasn't an accident." Dr. Levine testified that because Albright would not reveal all of his thoughts, the doctor could not say to a reasonable degree of certainty that Albright intended to kill Weeden. However, Dr. Levine could say "that it was a deliberate attempt to cause great harm based on the act."

Dr. Levine also testified that there was nothing about paranoid schizophrenia that would have prevented Albright from intending to kill Weeden. According to Dr. Levine, "Nothing about [Albright's] disease would make it hard or difficult or impossible to premeditate anything."

The jury was instructed on premeditated first-degree murder and intentional second-degree murder, and it was given the option of deciding "not guilty" by reason of mental disease or defect. The jury found Albright guilty of first-degree premeditated murder. The district court imposed a hard 40 sentence. Albright now makes a timely appeal.

## DISCUSSION

We first review Albright's contention that the prosecutor, in discussing premeditation in her closing argument, committed misconduct requiring reversal. During closing arguments, the prosecutor told the jury:

"Premeditation could be called planned. Someone could have a plan, and that would be premeditation. But as [defense counsel] explained to you and the Court instructed you, premeditation simply means to have thought the matter over beforehand. *Premeditation can occur in an instant.* I wanted to show you how premeditation had occurred. I didn't have it in mind until just now how I was going to do it, but there (demonstrating). That's how I decided to show you. It could happen that quickly. I decided to show you a certain act, hitting the podium. That was premeditation, and *it occurred in an instant.* That's how quickly it can occur." (Emphasis added.)

Albright acknowledges that he did not object to the prosecutor's comments. We do not ordinarily apply the plain error rule, and reversible error normally cannot be predicated upon a claim of prosecutorial misconduct during closing argument where no contemporaneous objection is lodged. However, if in examining the claimed error we determine that the misconduct might have risen to a level of violating a defendant's right to a fair trial, the claimed error will be considered. *State v. McCorkendale*, 267 Kan. 263, 278, 979 P.2d 1239 (1999). We conclude that Albright's closing argument claim qualifies for consideration; thus, the analysis of the effect of a prosecutor's alleged improper remarks is a two-step process. First, we must decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, we must decide whether the remarks constitute plain error, that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial. *McCorkendale*, 267 Kan. at 278-79.

The State observes that during the first portion of the prosecutor's closing argument, she said, "There is no time element to premeditation. I just have to prove that he had a chance to think about it." Later, the prosecutor said, "You think about it, and you react. That's premeditation." At the end of her arguments, the prosecutor said:

"Ladies and gentlemen, you were told a variety of facts, but they coalesce actually very simply into a coherent set of facts. Your job is a serious one. Your duty, however, is simple. You must look at the facts, apply the law and determine the defendant's mental state at the time. And based on all the facts you have, you must find the defendant guilty if you find whether based on a delusion or not, he acted intentionally and he thought about killing beforehand, and that's what the facts show."

The district court, in conformity with Pattern Instructions for Kansas (PIK) Crim. 3d 56.04(b) (premeditation), instructed the jury that "[p]remeditation means to have thought over the matter beforehand." We have consistently approved this jury instruction. See *State v. Jamison*, 269 Kan. 564, 573, 7 P.3d 1204 (2000).

In *State v. Moncla*, 262 Kan. 58, 936 P.2d 727 (1997), we rejected the district judge's inclusion of the phrase that premedita-

tion "may arise in an instant" in the jury instruction defining premeditation. *Moncla* concluded that the instruction did not constitute reversible error, although the addition of the phrase "it may arise in an instant" diminished the definition of premeditation and was inappropriate. 262 Kan. at 72.

We now turn to review our post-*Moncla* cases that have addressed a premeditation-misconduct contention similar to the one Albright advances here.

The State relies on *State v. Gholston*, 272 Kan. 601, 35 P.3d 868 (2001), to support its contention that the prosecutor's statements here did not deny Albright a fair trial. Gholston was convicted of first-degree premeditated murder. During closing argument, the prosecutor said:

" 'To have thought the matter over beforehand, how long does it take to consider that I'm going to intentionally kill you? *(Snaps finger.) It can be that quick.* It's not necessarily Hollywood, where we have the weeks of planning and you've seen those type [of] movies. In the State of Kansas, the law means the law, to have thought the matter over beforehand; *and if you believe Gholston pulled the trigger*, you know he thought the matter over beforehand.' " (Emphasis added.) 272 Kan. at 623.

We found that the *Gholston* prosecutor's argument did not purport to be an abstract statement of the law. Under the facts, the shooting was clearly premeditated. We concluded that under the circumstances, the prosecutor's statement was not reversible error. 272 Kan. at 623.

Albright contends that under *State v. Holmes*, 272 Kan. 491, 33 P.3d 856 (2001), the prosecutor's comments here warrant reversal. In *Holmes*, the prosecutor, after informing the judge as to the law at the jury instructions conference, deliberately misstated the law to the jury. The deliberate misstatement in *Holmes* required reversal. 272 Kan. at 499-500. The *Holmes* prosecutor said, " 'Ladies and gentlemen, premeditation can occur in an instant. That's the law in the State of Kansas.' " 272 Kan. at 497. We held that the district court's failure to correct the prosecutor's statement deprived Holmes of a right to a fair trial. 272 Kan. at 500. *Holmes* recognized that in *Jamison*, 269 Kan. at 573, we observed that the concept of "premeditation," as defined in PIK 56.04(b), was more

than the instantaneous, intentional act of taking another's life. *Holmes*, 272 Kan. at 499.

The closing argument issue here is controlled by our reasoning in *State v. Doyle,* 272 Kan. 1157, 38 P.3d 650 (2002); *State v. Wimbley,* 271 Kan. 843, 26 P.3d 657 (2001); *Gholston;* and *Jamison. Doyle* involved a closing argument claim similar to the one Albright asserts here. The prosecutor in *Doyle* argued to the jury:

> " 'Premeditation, as the Court instructed you, means to have thought about it beforehand. It does not mean that it had to be thought out beforehand two hours or one hour or a half an hour before the incident occurred. *Something can be premeditated as soon as it happens.*
>
> . . . .
>
> " 'That is all that "premeditation" means. It can be formed at any point in time.' " 272 Kan. at 1163.

During deliberations, the *Doyle* jury inquired: " 'Is there a specific amount of time before a crime is committed that "premeditated" is applied?' " The district court responded in writing, " 'No.' " 272 Kan. at 1163.

We affirmed Doyle's conviction by distinguishing *Holmes*, observing:

> "Under the *Holmes* facts, the prosecutor's deliberate misstatement of the law regarding premeditation was found to be reversible error.
>
> "Here, there is no indication that the prosecutor purposefully misstated the law. Furthermore, there is evidence of premeditation. . . .
>
> "The jury instruction in this case was a correct statement of the law on premeditation. The facts clearly support a finding that the murder of Kubik was premeditated." 272 Kan. at 1165-66.

In *Wimbley,* 271 Kan. 843, 849, the prosecutor argued in closing:

> "Premeditation requires no specific time period. That's what the law is. It doesn't require any. It doesn't say well, you have to think about it for 30 seconds, or five, or five hours or anything else. *Premeditation can occur in an instant. It can be a thought. Just like that (indicating).*" (Emphasis added.)

We said: "[W]ith regard to a nearly identical closing argument by the prosecutor in *Jamison,* we held that there was 'a very real distinction between the argument of a prosecutor and the instruction of a trial court.' " *Wimbley,* 271 Kan. at 850.

Here, as in *Jamison, Gholston, Doyle,* and *Wimbley,* there was evidence of premeditation. We find that the prosecutor's references to "an instant" in her closing argument were in error; however, the remarks do not constitute plain error, requiring reversal.

We repeat our recent admonition from *State v. Pabst,* 273 Kan. 658, 660, 44 P.3d 1230 (2002): "A discussion of PIK Crim. 3d 56.04(b) (premeditation) in closing argument should avoid any temptation to use a synonym to convey the suggestion of 'an instant' without using the actual phrase."

### Albright's Prior Conduct

Albright argues that the district court erred in allowing his witness, Dr. Logan, on cross-examination to testify regarding Albright's prior conduct. This contention lacks merit.

The admission or exclusion of evidence is a matter of judicial discretion. We examine admission determinations under the abuse of discretion standard. See *State v. Flourney,* 272 Kan. 784, 802, 36 P.3d 273 (2001). The extent of cross-examination for purposes of impeachment also lies within the sound discretion of the district court. *State v. Baacke,* 261 Kan. 422, 431-32, 932 P.2d 396 (1997).

Before reaching his conclusions, Dr. Logan reviewed Albright's previous hospitalization information, military records, some psychiatric records, family history, police reports involving Weeden's murder, witness statements, and police reports from past incidents. Regarding Albright's mental condition at the time of Weeden's murder, Dr. Logan testified that Albright was psychotic, delusional, and suffering from paranoid schizophrenia. According to Dr. Logan, Albright "couldn't think about things that were going on around him rationally, . . . he would see them only in light of his preconceived ideas that people were purposely harassing him; he was being threatened."

On cross-examination, the State questioned Dr. Logan about the information he had reviewed, including Albright's:

(1) threatening to kill his family and shoot his mother,

(2) twice holding a gun to his mother's head,

(3) breaking property around the house and punching holes in walls,

(4) hitting a desk top with a rifle butt,

(5) breaking windows,

(6) picking fights with his brothers and hitting his father,

(7) shooting his brother,

(8) assaulting a woman while at Larned,

(9) stalking a woman and attacking a perceived rival suitor,

(10) being asked to leave a church community because of his obsessing over a female member of that community,

(11) hitting a black man in a laundromat in 1979,

(12) having a problem with black people and interracial couples,

(13) having swastikas decorating his automobiles,

(14) possibly suspected of taking shots at kids with a shotgun or rifle at some time,

(15) accosting a bus driver in 1990 and throwing snowballs and shouting racial epithets at the driver,

(16) attacking a man in a telephone booth in 1990 and accusing him of being an undercover officer,

(17) attacking someone in a park for no reason in 1995 (Dr. Logan clarified that in this instance it was Albright who actually summoned the police and reported that he had been punched in the face),

(18) hitting his apartment manager in 1997 after she wanted to evict him for allegedly threatening and assaulting other tenants, and

(19) threatening the same apartment manager that if Albright did not get his mail, she was going to get a .38 caliber lead injection.

Albright's counsel made no objection until the State started questioning Dr. Logan about the police report involving the 1995 incident in the park (Item No. 17 on the above-numbered cross-examination list). Counsel objected to "the form of the question in having this particular witness testify as to the events in a police report." Counsel said she did not "think it's related to this examination or [Dr. Logan's] conclusions as an expert as it relates to that police report."

The prosecutor explained that her cross-examination was relevant to "state of mind." The district court found that the questioning had some probative value as to the weight and credibility of

Dr. Logan's report. The district court also concluded that the questioning was relevant to show that, at least on this one occasion, Albright had contacted the police and sought their assistance.

Later, when the prosecutor was questioning Dr. Logan about the police reports involving Albright's apartment manager in 1997, defense counsel again objected. Her objection was to the form of the question, to foundation, and to the details of police reports not being linked to Dr. Logan's conclusions and diagnosis. The district court required the prosecutor to ask Dr. Logan about the specific report and whether he had relied upon it in drawing any of his conclusions.

After further questioning of Dr. Logan about the incidents involving the apartment manager, Albright's counsel objected again, asserting that the prosecutor was "failing to relate this in any way to the mental examination" and was "attempting to use some 60-455 way to approach every bad act that's in the reports . . . ." At a bench conference, the district court said it looked like the prosecutor was "just doing a character assassination of bad acts" and expressed concern that "the prejudicial effect is outweighing the probative value." The prosecutor argued that the prior bad acts related to Albright's "prior state of mind." She noted that Dr. Logan claimed that Albright was delusional at the time of the murder. She thought the incidents were relevant to show that Albright could act intentionally just like the day of the murder. The prosecutor argued that the facts relied upon by Dr. Logan could be interpreted differently.

An argument followed regarding K.S.A. 60-455. The district judge said he would have to give a limiting instruction on how the jury "can't consider that evidence of other bad acts and crimes." The prosecutor said she did not want to offer the evidence under K.S.A. 60-455; rather, the specific acts were used to test Dr. Logan's credibility and to show the jury the underlying facts upon which his opinion was based. The State did not file a pretrial K.S.A. 60-455 motion for the admission of such evidence. The district court commented that the prosecutor was "kind of shotgunning it" and told her to refer the doctor to the specific report and to ask

him if he remembered it and if he used it to arrive at his opinions. If he did, then she could cross-examine the doctor about the report.

The defense requested PIK Crim. 3d 52.06 (proof of other crime—limited admissibility of evidence). At the instructions conference, Albright's counsel said that she thought the parties were "in agreement regarding the 60-455 instructions, that the other bad acts goes to intent." The district court gave the following jury instruction, in accordance with PIK Crim. 3d 52.06:

"Evidence has been admitted tending to prove that the defendant, Arthur R. Albright, committed crimes other than the present crime charged. This evidence may be considered solely for the purpose of proving the defendant's intent."

Albright disputes the admissibility of the specific-acts testimony. According to Albright, while his prior bad acts might have been relevant to Dr. Logan's cross-examination about whether and how they figured into his diagnosis and conclusions, they were not relevant as isolated prior bad acts. Albright maintains that the State inappropriately attempted to show his propensity towards violence and that the manner in which the evidence was introduced was more prejudicial than probative.

The State argues that the evidence was admitted to show errors in Dr. Logan's understanding of events upon which he based his opinion and to show the facts upon which he based his conclusions. As the State points out, the prosecutor may test the reasonableness of an expert's opinion during a proper cross-examination. See *Baacke*, 261 Kan. at 431.

In *State v. Dargatz*, 228 Kan. 322, 614 P.2d 430 (1980), we reviewed a similar cross-examination situation. Dargatz was convicted of incitement to riot and second-degree murder. On direct examination, defense counsel asked the examining psychiatrist whether Dargatz could have formed the intent to incite a riot. The psychiatrist said that "historically he's gotten himself in trouble. I suppose, several times by impulsiveness and lack of judgment." 228 Kan. at 330. Out of the hearing of the jury, the psychiatrist said he had considered prior crimes information that he had received from Dargatz' mother. The district court found that Dargatz' prior criminal behavior had been brought out during the direct examination

and was within the scope of cross-examination. The district court also concluded that the prior crimes evidence was relevant to show intent, or the ability to form criminal intent, under K.S.A. 60-455. On cross-examination, the psychiatrist said he had taken into account the past criminal record in forming his opinion about Dargatz' intent, and those crimes included the felonies of welfare fraud, giving a worthless check, burglary, and theft. Dargatz argued that this testimony was prejudicial and erroneously admitted into evidence.

We noted that the evidence of Dargatz' prior crimes was improperly admitted under K.S.A. 60-455 since there was no similarity between the offenses mentioned in the psychiatrist's testimony and inciting a riot. However, the evidence was admissible. Under K.S.A. 60-458, when an expert has given an opinion without specifying the data upon which the opinion was based, the underlying data is a proper subject of cross-examination. We also remarked that once an issue is raised on direct examination, the door is open. Cross-examination " 'may go into any phase thereof and may extend to the entire subject matter; it is not restricted to the identical details developed on direct examination or the specific facts testified to in chief.' " (Citations omitted.) 228 Kan. at 330-31.

Under the reasoning of *Dargatz*, the underlying data for Dr. Logan's expert opinion was a proper subject of cross-examination. The prosecutor's approach was initially questionable, but there was no defense objection until most of the prior acts were before the jury. A party must make a timely and specific objection to the admission of evidence at trial to preserve the issue for appeal. K.S.A. 60-404.

Once objections were made, the district court required the prosecutor to question Dr. Logan about the specific reports and whether he had relied upon the reports in arriving at his opinions. As for the jury instruction, PIK Crim. 3d 52.06, about which Albright complains, he requested the instruction. One who requests an instruction cannot on appeal complain of its use. See *State v. Osbey*, 238 Kan. 280, 284, 710 P.2d 676 (1985). We find no abuse of discretion in allowing the cross-examination testimony.

## Albright's Motion to Recall the Jury

Albright also contends that the district court erred by denying his motion to recall the jury. We disagree. According to Albright, while the parties were speaking with jurors after the trial, the foreman indicated that when considering first-or second-degree murder, the jury picked first-degree murder "so that [Albright] would get as much time as possible." Albright moved to recall the jury for a determination of whether the jury improperly considered postconviction penalties in reaching its verdict. He alleged that the jury violated the district court's instruction that the disposition of the case was a matter for the district court.

Our review of an order denying a motion to recall a jury is limited to whether the district court abused its discretion. *State v. Jenkins*, 269 Kan. 334, 338, 2 P.3d 769 (2000). A jury should not be recalled and questioned unless there is just cause to do so. A motion to recall should be granted only upon a showing of necessity. *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

The State argued that the mental processes by which a jury reaches its verdict should not be delved into by the district court. One of the prosecutors told the district court that he, too, heard the juror's statement but "didn't get the impression that that was the basis by which he reached his decision or any other juror did as well."

In denying Albright's motion to recall the jury, the district court noted that the jury was instructed that disposition was a matter for the court. The jury was also given the following instruction:

"If you find the defendant, Arthur R. Albright, not guilty solely because he at the time of the alleged crime was suffering from a mental disease or defect which rendered him incapable of possessing the required criminal intent, then he is committed to the state security hospital for safekeeping and treatment until discharged according to the law."

The district court reasoned that "[t]he Court, if nothing else, opened the door for them to consider the effect of their verdict and properly so pursuant to PIK . . . ." The district court opined

that Albright's requested inquiry would violate K.S.A. 60-441, which states:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or *concerning the mental processes by which it was determined*." (Emphasis added.)

We agree. In *State v. Franklin*, 264 Kan. 496, 500, 958 P.2d 611 (1998), we said:

" 'Under these statutes [K.S.A. 60-444(a) and 60-441] we have held that a juror may not impeach his or her verdict on any ground inherent in the verdict itself; a juror may not divulge what considerations personally influenced him or her in arriving at the verdict or what reasoning personally led him or her to the final decision.' [Citation omitted.]"

The district court did not abuse its discretion in denying Albright's motion.

### Albright's Hard 40 Sentence

Albright argues that *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied*, 532 U.S. 932 (2001), misread *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and, thus, was incorrectly decided. We are invited to overrule *Conley* and declare the hard 40 sentencing scheme unconstitutional. We decline the invitation. The basis of Albright's argument is that in *Conley*, we improperly relied on *McMillan v. Pennsylvania*, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986). Albright reasons that the Pennsylvania statute at issue in *McMillan* and the Kansas hard 40 sentencing scheme are not comparable. We have recently rejected this argument in *State v. Roberson*, 272 Kan. 1143, 1156, 38 P.3d 715 (2002). Albright's argument fails.

### The K.S.A. 22-3220 Constitutional Claim

Finally, Albright argues that K.S.A. 22-3220 (defense of lack of mental state) is unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, § 18 of the Kansas Constitution Bill of Rights, and Article 2, § 16 of the Kansas Constitution.

Albright did not raise his federal and state constitutional arguments at trial. When constitutional issues are raised for the first time on appeal, they are not properly before this court for review. We may consider such issues in exceptional circumstances. We have done so where the asserted error involves a strictly legal question that will be determinative of the case or where consideration of the new issue is necessary to serve the interests of justice or to prevent a denial of fundamental rights. *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999). Albright contends consideration of the K.S.A. 22-3220 constitutional issue in his case is necessary to serve the ends of justice. Although the issue is a legal one, his argument is not persuasive. K.S.A. 22-3220 became effective January 1, 1996. With the adoption of K.S.A. 22-3220, insanity and diminished capacity defenses were eliminated in Kansas. See *State v. Jorrick*, 269 Kan. 72, 81, 4 P.3d 610 (2000). K.S.A. 22-3220 has not only been discussed by this court in *Jorrick*, but also has been subjected to extensive discussion in legal periodicals. See, Rosen, *Insanity Denied: Abolition of the Insanity Defense in Kansas*, 8 Kan. J.L. & Pub. Pol'y 253, 254-55 (1999); Spring, *Farewell to Insanity: A Return to Mens Rea*, 66 J.K.B.A. 38, 45 (1997). We are not presented here with a new controlling ruling as in *Apprendi*. We find no exceptional circumstances that would convince us to depart from our traditional rule. We conclude the constitutionality of K.S.A. 22-3220 is not properly before us and will not be considered in Albright's appeal.

Affirmed.