NOT DESIGNATED FOR PUBLICATION

No. 116,788

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOE COREY HILL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed September 28, 2018. Affirmed.

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., PIERRON and BUSER, JJ.

PER CURIAM: A jury convicted Joe Corey Hill of 10 counts arising from a fight and a shooting, including one count of severity level 7 aggravated battery and one count of attempted first-degree murder. Hill appeals, arguing: (1) The State did not present sufficient evidence to support his convictions; (2) the district court erred in failing to give a cautionary eyewitness identification instruction; (3) the district court erred in failing to declare a mistrial sua sponte because of contact between Hill's family and the jury; and (4) cumulative error deprived him of a fair trial. Finding no error, we affirm.

1

On September 7, 2014, Hill and Kiara Adkins attended a barbecue at the home of Lataysia Jordan, Kiara's cousin. At the time, Kiara and Hill had been dating and living together for about a year and a half.

Hill was cooking ribs on the grill, and Kiara wanted to check if they were done. She tried to pick one up, but Hill snatched it from her. They began arguing, and Hill put both of his hands around Kiara's neck. Kiara thought he was playing around at first but quickly realized she could not breathe. She pushed Hill to try to get him off her. After a few seconds, she broke free.

Kiara kicked over Hill's cup. In response, Hill pinned her against the screen door, slapped her, and punched her on the mouth. Kiara went inside the house and grabbed two knives, but her cousin took them away before she could go back outside to Hill. Kiara yelled to Hill that she was going to call her brother, Malik Adkins. Hill walked off.

Kiara called Malik, and he arrived at Jordan's house soon after. He stayed for about 30 minutes to see if Hill would come back. When Hill did not return, Malik left. Soon after Malik left, Ronnie Banks Jr., Kiara's cousin, arrived with Desiree Hunt and their two children.

A little while later, Hill called Kiara to ask who was at Jordan's house. Kiara asked why he wanted to know and Hill stated he would be coming back soon and hung up. Kiara called Malik again to let him know Hill was on his way.

Malik returned to Jordan's house and sat down on the porch to wait for Hill. After a bit, Hill showed up with several other people, including Bradford Storey and Dezmunn Flowers. They got out of their car and started arguing with Kiara and Malik. Kiara saw Flowers fidgeting with something in his pants. She believed he had a gun in his

2

waistband. Banks also saw the outline of a gun through Flowers' pants. Kiara asked Flowers why he had brought a gun, but he denied he had one with him.

Hill and Malik moved out to the street and briefly got into a fistfight. After the fight ended, Kiara's uncle arrived and told everyone to leave. Hill, Storey, and Flowers got in their car and left. Malik also went home.

As everyone was dispersing, Banks, Hunt, and their children prepared to leave but their car would not start. Kiara's father had shown up after the fight and offered to help Banks jump-start his car. Shortly after Kiara's father parked his car in front of Banks' car, gunshots were fired.

It was dark outside when the first shots were fired. Banks, Hunt, and their two children were by their car. Kiara, her sister, her father, and her stepmother were standing in the yard.

Kiara saw two bullets ricochet off the ground. Her sister grabbed her and they began running. Kiara made it across the street when she realized a bullet had hit her in the right thigh and passed all the way through her leg. Kiara fell to the ground screaming.

Witnesses reported hearing four to seven shots. When the shots stopped, Kiara's father picked her up and drove her to the hospital.

Police officers arrived at the scene at 9:30 p.m. They found four 9-millimeter shell casings at the southwest corner of Jordan's home, about 35 feet from the bullet strike marks in the ground. Near the casings, they found what they believed to be a crack pipe.

Shortly after the shooting, Kiara's aunt, Quenna Ogunbiyi, and Ogunbiyi's cousin arrived at a club near the scene of the shooting. They noticed the police cars by Jordan's

house. Because Kiara also lived in that area, Ogunbiyi called Kiara's mother to ask what had happened. She told Ogunbiyi that someone had shot Kiara.

Ogunbiyi and her cousin then saw Hill and another man walking out of an alley in Jordan's neighborhood toward the club. Ogunbiyi told Hill that someone had shot Kiara. Hill said he had not heard that Kiara had been shot. Ogunbiyi told Hill what hospital Kiara was at. Hill said he was on his way there.

Kiara underwent surgery for her bullet wound and stayed in the hospital for four days. Hill never came to visit her and never contacted her again after the shooting.

The State eventually charged Hill with one count of aggravated battery and one count of battery arising from his fight with Kiara at the barbecue: The State also charged him with one count of attempted first-degree premeditated murder; one count of aggravated battery; four counts of aggravated assault; one count of criminal discharge of a firearm; and one count of criminal possession of a weapon by a convicted felon arising from the shooting.

At trial, the State presented testimony from Kiara, Malik, Banks, and Hunt, along with several other witnesses and police officers. Banks and Hunt both identified Hill as the shooter. Banks said he saw a flash by the southwest corner of Jordan's home at the time of the shooting. He then saw Hill firing a gun. Hill was wearing the same clothes he had been wearing earlier that day—a black tank top and basketball shorts.

Hunt testified she saw a flash from a gun when the shooting started. At first, she ducked behind a car and told her children to do likewise. She then looked up and saw Hill shooting. She made eye contact with Hill. She said Hill was wearing the same thing he had been wearing earlier that day.

Banks and Hunt stated they knew Hill because he had come to their apartment the night before the shooting for a movie night. That was the first time Hunt had met Hill. It was the second time Banks had met him.

Hill said that when Kiara went to take the ribs off the grill, he told her they were not done. They got in a fight. Kiara scratched him on his face and arms, and Hill pushed her and tried to put the ribs back on the grill. At one point, Hill put his hands around her neck, but he denied he had choked her.

According to Hill, Kiara ran into the house to get the knives. She came outside, pointed the knives at Hill, and threatened to stab him if he touched her again. Kiara eventually put her hands down, and Hill took the knives. He gave them to Jordan to put away. Kiara told Hill she was going to call Malik. Hill called his godmother for advice on what to do. She told Hill to just leave, so he did.

Hill testified that after leaving Jordan's, he went to the home of his friend, Nicole Jones. He then left to meet up with Flowers. On his way to meet Flowers, Hill received a call from Malik who told him to "bring your ass over [to Jordan's] so I can beat your ass." After meeting up with Flowers, Storey picked them both up. Another man was already in the car with Storey, but Hill did not know him. Hill denied that any of them had a gun.

Storey drove the four of them back to Jordan's house. Hill got out of the car. Kiara walked up to him and asked if he was going to fight Malik. Hill stated that he did not want to fight. Instead, he just wanted to talk to Malik. But when Malik walked up to Hill, the two started fighting. After the fight ended, Hill, Storey, and Flowers left and drove Hill to Jones' house, where he stayed for two days. Hill said he then left Jones' house to donate plasma and police arrested him at the donation site. At the time, he thought he was being arrested for domestic violence.

Hill testified that even though he and Kiara had dated for two years, he did not call to check on her after the shooting. He also did not call or text any of her family members to ask if she was okay. He testified he did not check on her because they had broken up on the day of the shooting.

During cross-examination, Hill stated he did not have his cellphone with him that day, despite his testimony that he had spoken to Malik on his phone. Hill maintained that once he arrived at Jones' house after the fight with Malik, he did not leave again for two days. However, he also said he did leave later on the night of the shooting to go to Quik Trip. There, he ran into Ogunbiyi who told him someone had shot Kiara. Ogunbiyi denied seeing Hill at Quik Trip.

Hill admitted that in his initial interview with police, he said that when he went to Jones' house after his fight with Kiara he did not leave again for two days. He did not tell police that he went back to Jordan's house and fought with Malik. He also testified he admitted in the interview that he choked Kiara, but he was lying about that.

Several other witnesses testified for the defense, including Hill's brother, Marquel Hill, and Hill's sister, Sheala Hill. Marquel testified he got a phone call from Hill around 9 p.m. the night of the shooting. Hill told Marquel he was at Jones' house. Shaela also testified she got a call from Hill around 8 or 9 p.m. that night. Marquel and Sheala both testified Hill had called from Jones' phone, and the caller ID had shown up as "private." Marquel testified that Hill was using Jones' phone because he did not know where his cellphone was. Neither Marquel nor Sheala saw Hill that day.

Jones testified that Hill had come to her house after his fight with Malik. She could not say exactly what time he got there, but it was right before it got dark outside. She did not remember Hill coming over earlier that day and leaving again. She also stated that Hill had his cellphone with him and was using it.

6

The jury convicted Hill on all 10 counts. The district court sentenced him to a controlling term of 653 months in prison. Hill appeals.

*Sufficient Evidence*

Hill argues the State did not present sufficient evidence to support 9 of his 10 convictions. He concedes that he committed misdemeanor battery when he slapped and punched Kiara. But he contends the State did not prove that he choked Kiara. He also asserts that Banks' and Hunt's eyewitness identifications of him as the shooter are unreliable and that is the only direct evidence supporting his convictions arising from the shooting.

"'When the sufficiency of evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). In determining sufficiency, this court does not reweigh evidence, resolve evidentiary conflicts, or make determinations as to witness credibility. *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016). Only on rare occasions will this court reverse a guilty verdict because testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

The State charged Hill with a severity level 7 aggravated battery for choking Kiara. To prove that Hill committed a severity level 7 aggravated battery, the State had to show that he "knowingly caus[ed] harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2017 Supp. 21-5413(b)(1)(B). The evidence is sufficient to support Hill's conviction for this aggravated battery. Kiara testified she was arguing with Hill when he put his hands

around her neck. She was unable to breath and had to push Hill away to free herself. Jordan testified she saw Hill choking Kiara. Hill originally admitted to police that he had choked Kiara.

In his brief, Hill claims he did not choke Kiara. He alleges he was pushing Kiara away from the grill and his hands merely "landed on her throat for a couple of seconds." He argues that some evidence supports this. He points out that Kiara did not think he was serious at first. He also notes that his hands were only around Kiara's neck for a brief time before Kiara broke free, supposedly suggesting he was not holding on to her firmly. But Hill is simply asking us to reweigh the evidence, which is not our role. Looking at the evidence in the light most favorable to the State, as we must, a reasonable fact-finder could find Hill guilty.

Hill also argues the State did not present sufficient evidence to support his eight convictions arising from the shooting. First, he argues the State failed to prove he was the shooter. Second, he asserts the State failed to prove he acted with the intent to commit first-degree premeditated murder.

The State presented sufficient evidence that Hill was the shooter. Two eyewitnesses saw him firing the gun. Those witnesses both knew Hill and had hung out with him the day before. Ogunbiyi also saw Hill near the scene shortly afterward. And while Hill testified he was not the shooter, he could not provide a consistent alibi for the night of the shooting.

Still, Hill argues the evidence supports other reasonable theories about who the shooter was. He argues a jury could have reasonably concluded Bradford was the shooter because he was encouraging Hill and Malik to fight. He points out that Bradford had been doing cocaine before the shooting, and the police found a crack pipe near the shell casings.

He also argues a jury could have reasonably concluded Flowers was the shooter, because witnesses believed he had a gun that day. He argues that one of two unknown pedestrians, who had walked past Jordan's house that evening and were "mugging" the crowd, could have been the shooter.

Hill argues that Banks' and Hunt's eyewitness identifications were unreliable. He contends they only got a brief glimpse of the shooter at night from 35 feet away during a fearful and chaotic moment. He adds that neither Banks nor Hunt knew Hill particularly well. He alleges the couple "would have likely discussed the situation at home."

Hill is again asking us to reweigh the evidence and redetermine witness credibility. But we may not do so under our standard of review. Banks' and Hunt's testimonies were not so incredible that no rational fact-finder could rely on them in reaching a guilty verdict. Looking at the evidence in the light most favorable to the State, a rational juror could find that Hill was the shooter.

Hill also argues that the evidence was insufficient to show he intended to commit first-degree premeditated murder, an element of his attempted first-degree murder conviction. K.S.A. 2017 Supp. 21-5301(a); K.S.A. 2017 Supp. 21-5402(a)(1). First-degree murder is "the killing of a human being committed intentionally, and with premeditation." K.S.A. 2017 Supp. 21-5402(a)(1). A person acts intentionally "with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result." K.S.A. 2017 Supp. 21-5202(h). "Premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation." *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014).

The State may use circumstantial evidence to prove intent and premeditation if the jury can reasonably infer intent and premeditation from that evidence. 299 Kan. at 467. Kansas courts use these factors to determine if circumstantial evidence gives rise to an inference of premeditation: "'(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. [Citation omitted.]'" 299 Kan. at 467. The number of factors present does not determine what inferences a jury may reasonably draw. Sometimes one factor alone will be enough to show premeditation. 299 Kan. at 467.

Here, the State presented sufficient evidence from which the jury could reasonably infer intent and premeditation. Hill used a gun to commit this offense and fired several rounds in Kiara's direction. While he had been in a fight with Kiara earlier that afternoon, Hill had already left the scene and waited until nighttime to commit the offense. Hill never visited Kiara in the hospital or spoke to her again after the shooting, even though the couple had dated and lived together for a year and a half before the incident.

Hill argues that a jury could infer that the shooter intended only to scare the group of people outside Jordan's house. But again, our job is not to reweigh the evidence and consider all possible interpretations. Instead, we must determine whether the State presented sufficient evidence to support Hill's conviction. Looking at the evidence in a light most favorable to the State, it did.

*Jury Instructions*

Hill argues the district court committed clear error when it failed to give the cautionary eyewitness identification instruction, PIK Crim. 4th 51.110 (2017 Supp.). He claims Banks' and Hunt's identification of him was unreliable for the same reasons he

listed in Issue I. The State responds that we should not address this issue because Hill invited the error.

*Invited Error*

Before reaching the merits of Hill's argument, we must first determine if the invited error doctrine precludes review. In his brief, Hill states that his defense counsel originally objected to the district court's failure to give the cautionary eyewitness identification instruction but later withdrew that objection. He contends that his defense counsel in effect merely failed to object, and this issue is subject to a review for clear error.

Hill's description of what happened at the district court level is not accurate. His defense counsel first requested the cautionary eyewitness identification instruction, but he later withdrew that request at the jury instruction conference. He explained that the relevant caselaw showed that the instruction was not appropriate if an eyewitness was personally acquainted with the defendant. He admitted the instruction would not be appropriate here because Banks and Hunt both testified they had been with Hill the night before the shooting. The district court agreed and did not give the instruction.

Because defense counsel withdrew his request for this instruction, the State argues that the invited error doctrine bars review of this issue. Under the invited error doctrine, a defendant cannot challenge an instruction on appeal, even as clearly erroneous under K.S.A. 2017 Supp. 22-3414(3), when there has been an on-the-record agreement to the wording of the instruction at trial. *State v. Peppers*, 294 Kan. 377, 393, 276 P.3d 148 (2012). Here, defense counsel requested the instruction, then withdrew that request because the instruction was inappropriate. By stating that the instruction was inappropriate, defense counsel was effectively agreeing that the district court should not give the instruction. This issue is therefore not properly before us. See *State v. Hall*, No.

11

109,602, 2014 WL 3843085, at *5 (Kan. App. 2014) (unpublished opinion) (finding invited error doctrine applied when defense counsel "abandoned the earlier position taken in [defendant's] proposed instructions").

All the same, Hill's argument lacks merit. Hill concedes he did not properly preserve this issue for review, so we will not reverse the verdict unless he can show the giving of the instruction was clearly erroneous. K.S.A. 2017 Supp. 22-3414(3); *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 (2015). In reviewing for clear error, we first consider whether the instruction was legally and factually appropriate, using an unlimited review of the entire record. *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016). If the instruction was erroneous, there could be reversal if we are firmly convinced the jury would have reached a different verdict without it. *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016). In evaluating whether an instruction rises to the level of clear error, we conduct an unlimited review of the entire record. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

*Eyewitness Identification Instruction*

Hill argues the district court should have given an instruction on eyewitness identification based on PIK Crim. 4th 51.110 (2017 Supp.). That instruction provides:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he)(she) has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:
"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

12

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant(s) on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification; and

"6. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." PIK Crim. 4th 51.110 (2017 Supp.).

In criminal actions in which eyewitness identification testimony is critical to the State's case and there is serious question about the identification's reliability, the district court should give a cautionary instruction advising the jury of the factors it should consider in weighing the credibility of the identification testimony. *State v. Mann*, 274 Kan. 670, 677, 56 P.3d 212 (2002). But if the eyewitness personally knows the defendant, the court need not give this instruction. In that case, the defendant can challenge the accuracy of the identification through cross-examination. *State v. Calvin*, 279 Kan. 193, Syl. ¶ 9, 105 P.3d 710 (2005).

Banks and Hunt testified they knew Hill and had hung out with him the night before the shooting. Banks also stated he had meet Hill on another occasion. As a result, the cautionary eyewitness instruction was unnecessary, and the district court did not err in failing to give it. See *State v. Saenz*, 271 Kan. 339, 354, 22 P.3d 151 (2001) (holding when witness had seen defendant earlier in the evening at a bar, witness' reliability was not questionable and district court did not have to give eyewitness instruction).

Even if the district court had erred in failing to give the instruction, that error was harmless. Defense counsel cross-examined both Banks and Hunt about the reliability of their identifications. Defense counsel also argued that Banks' and Hunt's identifications were unreliable in closing argument. Finally, the court generally instructed the jury on

13

witness credibility. While Hill argues the court's failure to give this instruction raises serious questions about the verdict, his argument is unconvincing, and we affirm.

*Mistrial*

Hill argues the district court erred by failing to declare a mistrial sua sponte because of contact between jurors and members of Hill's family. During jury deliberations, several jurors reported to the district court's administrative aide that Hill's family had contact with the jurors several times. In one instance, jurors had to walk past some of Hill's family outside a bathroom, and the family gave the jurors intimidating looks. In two other instances, jurors had passed some family members on the way to or in the parking garage, and the family again gave the jurors intimidating looks.

The administrative aide brought this to the attention of the district court. The court held a hearing on the matter, noting it was a "grave concern" that this had happened and what effect it might have on the jury. The court discussed the matter with the parties, and both parties recommended that the court should ask the jurors individually if they could still be fair and impartial to both sides. They also agreed the court would ask the jurors if they understood they must decide the case on the evidence and not on outside influences.

The district court then called each juror into the courtroom individually. All the jurors told the court that they could be fair and impartial, and they understood they must decide the case on the evidence and not outside influences. At the end of the questioning, the court asked if the parties had "any statements, responses, or request[s]." Both parties told the court they were satisfied with the questioning.

After the jury returned the verdict convicting Hill on all charges, he moved for a new trial. He argued: "Although each juror indicated they could [be fair and impartial to both parties], [Hill] asserts the incident in question, with which [Hill] had no

14

involvement, prejudiced the minds of the jury to the point where they were unable to be fair and impartial." The district court denied the motion.

On appeal, Hill does not argue that the district court erred in denying his motion for a new trial. Instead, he argues that the district court erred in failing to declare a mistrial sua sponte. Hill asserts the court should have declared a mistrial under K.S.A. 22-3423(1)(a), because it was "physically impossible to proceed with the trial in conformity with law." He contends the court's failure denied him a fair trial.

To begin with, the invited error doctrine makes review of this issue problematic. A litigant may not invite error and then complain of that error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). After the district court learned of the contact between Hill's family and the jurors, the court conferred with the parties. The parties recommended that the court individually question the jurors to determine if they could remain impartial. After the court complied with the parties' recommendation, defense counsel told the court he had no further requests and he was satisfied with the questioning.

The district court did not err in failing to declare a mistrial. A district court may declare a mistrial sua sponte, and we review a failure to declare a mistrial for an abuse of discretion. See *State v. Wimbley*, 271 Kan. 843, 851-52, 26 P.3d 657 (2001). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

On appeal, Hill asserts we should review this issue de novo. He cites *State v. Gibbons*, 256 Kan. 951, 889 P.2d 772 (1995), for support. There, the Kansas Supreme Court reviewed whether the district court's failure to perform its duty to mitigate the

15

effect of prosecutorial misconduct by declaring a mistrial sua sponte denied the defendant a fair trial. 256 Kan. at 961-64.

Since *Gibbons*, though, the Kansas Supreme Court has reviewed whether a district court erred in not declaring a mistrial because of potential juror prejudice, either at the defendant's request or sua sponte. See *Wimbley*, 271 Kan. at 852; *State v. Rayton*, 268 Kan. 711, 721, 1 P.3d 854 (2000). Those cases reviewed the district court's actions for an abuse of discretion. This standard also appears more appropriate for this issue, because the district court is in a better position to determine whether potentially prejudicial conduct has actually prejudiced the jury. See 268 Kan. at 722; see also *State v. Cheever*, 306 Kan. 760, 787, 402 P.3d 1126 (2017) (reviewing district court's ruling on challenge for cause under abuse of discretion standard because "only the district court is in a position to view the demeanor of prospective jurors during voir dire"). Thus, we will review this issue for an abuse of discretion.

Hill argues the district court should have declared a mistrial under K.S.A. 22-3423(1)(a) because it was "physically impossible to proceed with the trial in conformity with law." But juror prejudice does not appear to be the kind of physical impossibility contemplated by K.S.A. 22-3423(1)(a). Kansas courts have applied this subsection to structural or procedural errors, such as a legally insufficient number of jurors. See *State v. White*, 275 Kan. 580, 601-02, 67 P.3d 138 (2003) (holding district court did not abuse its discretion in declaring mistrial because jury did not have legally required number of members); see also *State v. Smith*, 16 Kan. App. 2d 478, 480-81, 825 P.2d 541 (1992) (holding district court did not abuse its discretion when it declared a mistrial because the district court had not given the defense the statutorily required number of peremptory challenges). Potential juror prejudice does not appear to be this same kind of error and Hill does not explain why it would be.

16

Hill has failed to cite any other basis to support a mistrial. He has thus waived and abandoned this issue. See *State v. Murray,* 302 Kan. 478, 486, 353 P.3d 1158 (2015) (holding failure to support point with pertinent authority is like failing to brief issue). That said, the State cites the standard for reviewing a district court's decision on a motion for mistrial under K.S.A. 22-3423(1)(c), which states a district court may declare a mistrial if "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

Generally, a district court must use a two-step analysis when evaluating a motion for mistrial under K.S.A. 22-3423(1)(c). The district court must first decide if there is prejudicial conduct, inside or outside the courtroom, resulting in a fundamental failure in the proceeding. If so, the district court must next decide whether the conduct makes it impossible to continue the trial without injustice or whether the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. *State v. Moyer*, 302 Kan. 892, 906, 360 P.3d 384 (2015).

This two-step analysis applies to a district court's decision on a motion for mistrial under K.S.A. 22-3423(1)(c). It is unclear whether this same analysis applies in determining whether a district court should have declared a mistrial sua sponte because of prejudicial conduct. See, e.g., *State v. Barnhart*, No. 112,067, 2015 WL 5927022, at *2 (Kan. App. 2015) (unpublished opinion) (finding district court abused its discretion by not declaring a mistrial sua sponte because of prejudicial conduct without applying two-step analysis). Neither party has briefed this issue. But assuming, without deciding, that this analysis does apply, the district court still did not err.

Here, the district court took the proper steps to determine whether a fundamental failure in the proceedings had occurred. Upon learning of the contact between Hill's family and the jurors, the court consulted with the parties. Following the parties' recommendation, the court held a hearing and individually questioned the jurors. All the

17

jurors affirmed they could remain impartial and they understood they must decide the case on the evidence and not outside influences. Even though Hill's family had contact with the jury, the court properly verified that this contact did not result in a partial jury. See *Wimbley*, 271 Kan. at 852 (finding district court did not err in failing to declare mistrial sua sponte based on potential juror bias); see also *Rayton*, 268 Kan. at 721 (finding district court did not err in denying motion for mistrial when defendant's brother, who was also a defense witness, gave jury intimidating looks).

Even if a fundamental failure had occurred, the district court cured that failure through instructions and admonitions to prevent substantial prejudice to the defendant's right to a fair trial. See *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011). Here, the district court originally instructed the jury that it must base its verdict entirely on the evidence and law. After the contact with Hill's family, the court also asked the jurors if they understood they must decide the case on the evidence and not on outside influences. Without evidence to the contrary, we presume the jury followed the district court's instructions and admonitions. *State v. Perez*, 306 Kan. 655, 672-73, 396 P.3d 78 (2017); see also *State v. Lloyd*, No. 113,486, 2016 WL 6568746, at *7 (Kan. App. 2016) (unpublished opinion) (holding district court's meeting with juror and the general jury instructions cured any potential prejudice caused by contact between defense witness and juror). As a result, Hill's argument fails.

*Cumulative Error*

Finally, Hill argues that cumulative error deprived him of a fair trial. In reviewing this issue, we determine whether the totality of the circumstances establish that cumulative errors substantially prejudiced the defendant and denied him or her a fair trial. In assessing the cumulative effect of errors during trial, we examine the errors in the context of the entire record, considering how the district court dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the

18

overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014); see *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016). We will find no cumulative error when the record fails to support the errors the defendant raises on appeal. *Marshall,* 303 Kan. at 451.

Hill has failed to show any error occurred at his trial. In addition, the evidence against Hill was strong. Both Kiara and an eyewitness testified that Hill had choked her. Two other eyewitnesses saw Hill firing a gun at the time of the shooting. Ogunbiyi and her cousin also saw Hill near the scene of the shooting shortly after it happened. Hill had no consistent alibi for his whereabouts at the time of the shooting. Cumulative error therefore did not deprive Hill of a fair trial.

In conclusion, the State presented sufficient evidence to support all 10 of Hill's convictions. The district court did not err in failing to give the cautionary eyewitness identification instruction because the eyewitnesses knew Hill. The court also did not abuse its discretion by failing to declare a mistrial sua sponte because of contact between defense witnesses and jurors. The jurors all stated they could be fair and impartial. And because Hill has failed to show any error at his trial, cumulative error does not require reversal of his convictions.

Affirmed.